UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

LEE HALL,                                    )
      formerly known as Leroy Hall, Jr.,    )
                                            )
      Petitioner,                             )
                                            )
v.                                           )          NO. 2:06-CV-56
                                            )          *Greer/Inman*
RICKY BELL, Warden,                          )
                                            )
      Respondent.                             )

## MEMORANDUM OPINION

### I. Introduction

    Lee Hall ("Hall" or "petitioner"), a death-row inmate in the Riverbend Maximum Security Institution in Nashville, Tennessee, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a motion for summary judgment and petitioner a response in opposition. (Docs. 40, 45). The summary judgment motion was the subject of a hearing before the Court on June 25, 2008. Respondent has also filed the extensive state court record in this case. (Docs. 11, 27). For the following reasons, respondent's motion will be **GRANTED**, and this petition **DISMISSED**.

### II. Procedural History

    In 1992, Hall was convicted of first degree premeditated murder and aggravated arson, receiving for these respective offenses, a sentence of death and a consecutive 25-year prison

term.[1]  His conviction and sentence were affirmed on direct appeal—first by the Tennessee Court of Criminal Appeals, *State v. Hall*, 1996 WL 740822 (Tenn. Crim. App. Dec. 30, 1996), and then by the Tennessee Supreme Court.  *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997).  The United States Supreme Court denied the petition for certiorari which followed. *Tennessee v. Hall*, 524 U.S. 941 (1998).  Hall next pursued post-conviction relief, but was unsuccessful in the state courts, *Hall v. State*, 2005 WL 2008176 (Tenn. Crim. App. Aug. 22, 2005), *permission to app. den.* (Tenn. 2005), and equally unsuccessful in petitioning for a writ of certiorari in the Supreme Court.  *Hall v. Tennessee*,  544 U.S. 985 (2005).  He now applies to this Court for a writ of habeas corpus, alleging that his confinement is unlawful.

III.  **Factual Background**

The facts are drawn from the Tennessee Supreme Court's opinion during Hall's direct review.

A jury in the Hamilton County, Tennessee Criminal Court found Hall guilty of the April 16, 1991 first degree murder of Traci Crozier, his former girlfriend, and aggravated arson in the burning of her car as she lay in the front seat.  The couple had lived together for more than five years, but in late March of 1991, some three weeks prior to her murder, the victim severed those living arrangements and moved in with her grandmother, Gloria Mathis, and her uncle, Chris Mathis.  During that 3-week period, petitioner frequently telephoned the Mathis residence, searching for Ms. Crozier.  In the wee morning hours of April 6, 1991, Ms.

---

[1]  Petitioner's sole challenge in his habeas petition is to the murder conviction.

Crozier's car—a Nissan Laser—was set afire while parked in the driveway of the Mathis home.  Mr. Mathis saw petitioner fleeing from the burning car and fired a shotgun into the air.  The fire department was called, the fire extinguished, and the arson investigated.  Hall continued to telephone the Mathis home, often calling late at night.  Once, Mr. Mathis took the call and threatened him to leave her alone.  Hall retorted: "If I can't have her, nobody can't (sic)."

Just before midnight ten days later, Viola Wylene Price, a neighbor of the Mathises, was getting out of her car when she observed a "ball of fire" in the middle of the street and, speeding away from the scene, a black automobile, later identified as being similar to petitioner's.  Ms. Price ran into her house and called for emergency assistance.  Her son overheard the call; rushed outside; saw a burning car; heard someone inside it screaming for help; ran to the scene, and approached the driver's side of the car, where the door was open.  However, his view into the vehicle was obscured by the flames, so he darted to the other side of the Nissan, saw Ms. Crozier trying to crawl through the passenger side door window to escape the inferno, and pulled her from the vehicle.  Ms. Price's son then removed the victim's blazing shoes and clothes, extinguished the flames on her body, and helped her move away from the vehicle, anticipating a possible explosion.

When Ms. Price completed her call to 911, she too rushed to the scene and saw the victim severely burned, with her hair melted and her skin hanging from her arms.  Despite the severity of Ms. Crozier's burns, she was coherent and alert.  She gave Ms. Price her address and phone number and identified the perpetrator as "Lee Hall."  She voiced concern

about her appearance and the likelihood that she would be permanently scarred from the burns. Ms. Crozier also said that Hall had set fire to her car twice before, exclaiming that he "threw gas on me, gas bomb" and "it was gas, gas bomb. He set me on fire."

Responding to the emergency call was a Chattanooga fire department official, Commander Earl Atchley. Ms. Crozier, though badly burned, recognized Commander Atchley as the fire official who had investigated the April 6th arson of her automobile and told him that the same person was responsible for both incidents. The fire official recovered a melted plastic container next to the driver's side of the car and nearby a plastic lid, less melted than the container.

The victim was taken to the hospital, in constant pain and conscious, until just before her death hours later from her wounds. The physician who treated her at the hospital described the burn injuries as "a total body surface area burn, 95 percent of her body was burned, and all but about two to three percent of that was third degree burns." The doctor also characterized those injuries as "unsurvivable."

In June of 1991, the Grand Jury charged petitioner in a single-count indictment with premeditated and felony murder in the first degree. In a second indictment, he was charged with aggravated arson. From March 3 to March 11, 1992, Hall, represented by two appointed attorneys,[2] was tried and found guilty of premeditated first degree murder and aggravated

---

[2] One attorney, William R. Heck, had been retained for the preliminary hearing, but when his client's funds were exhausted at the end of those proceedings, he was appointed to represent petitioner at trial.

4

arson.  Hall was sentenced to death upon a finding of two aggravating circumstances—that the murder was especially heinous, atrocious or cruel and that the murder was committed during the perpetration of arson.

## IV.  Discussion

The petition presents eleven (11) separate grounds for relief and numerous claims and sub-claims within those grounds.  In the summary judgment motion, respondent warden argues that many of petitioner's claims have been procedurally defaulted or barred by the retroactivity rule in *Teague v. Lane*, 489 U.S. 228 (1989).  The Warden also suggests that relief on the remaining claims is unwarranted under the deferential review standards of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"). Petitioner, of course, opposes the motion, contending that no claims have been procedurally defaulted and that he is entitled, without any further factual development, to a writ of habeas corpus with respect to seven of the eleven claims.

A. Rules Governing Summary Judgment, Exhaustion and Procedural Default.

Summary judgment will be granted with respect to the motion or to any claim raised in the petition so long as filings before the Court demonstrate that there is no genuine issue of material fact and that respondent is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*,  477 U.S. 317, 323 (1986).

A state prisoner who petitions for habeas corpus relief must first exhaust his available state court remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.  28 U.S.C § 2254(b) (1).  The exhaustion rule requires *total* exhaus-

tion of state remedies, *Rose v. Lundy*, 455 U.S. 509 (1982) (emphasis added), meaning that a petitioner must have fairly presented each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999), unless a state rule makes review by the highest state court an unavailable remedy. *Adams v. Holland*, 330 F.3d 398, 405 (6th Cir. 2003) (finding that Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court to exhaust a federal claim). Furthermore, in order to fairly present a claim, it must have been offered to the state courts on substantially the same factual and legal bases upon which it rests in the federal petition. *Vasquez v. Hillary*, 474 U.S. 254, 260 (1986); *Picard v. Connor*, 404 U.S. 270, 278 (1971).

The procedural default doctrine is ancillary to the exhaustion requirement. *See, generally, Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000) (noting the interplay between exhaustion and procedural default doctrines). If a claim has not been presented to the state courts, but a state court remedy is no longer available (i.e., when an applicable statute of limitations bars a claim), then the claim is deemed to have been procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). If a claim has been presented to state courts, but those courts reject it on the basis that it has not been raised in compliance with a state procedural rule, it too has been procedurally defaulted. *See, e.g., Murray v. Carrier*, 477 U.S. 478 (1986).

In either scenario, the procedural default forecloses federal habeas corpus review, unless a petitioner shows "cause" to excuse his failure to fairly present the claim and "actual

prejudice" stemming from the constitutional violation, *Coleman*, 501 U.S. at 732; *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977), or, alternatively, that a failure to review the claim will result in a miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995). However, the latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Id.* at 323.

The claims have been divided into the following two categories—adjudicated claims and procedurally defaulted claims.

B. Adjudicated Claims.

Decisions of the state courts are reviewed pursuant to 28 U.S.C. § 2254(d), which limits a federal district court's jurisdiction to examine habeas claims on the merits. For example, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C.§ 2254(d)(1) and (2). A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts that cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable application" of federal law under §

2254(d)(1) occurs when the state court decision correctly identifies the governing legal rule in Supreme Court cases but unreasonably applies or unreasonably refuses to extend that principle to the particular facts of the case. *See id.* at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *see also Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) ("[T]he difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."). The habeas court is to determine <u>only</u> whether the state court's decision is objectively reasonable, <u>not</u> whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

In addition, state court factual findings are to be presumed correct unless a petitioner offers clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). That presumption also applies to credibility findings made by state courts. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. den.*, 520 U.S. 1257 (1997), *overruled on other grounds* by *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated* by *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989). And, while "deference does not imply abandonment or abdication of judicial review," *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), the "highly deferential standard" dictated in § 2254(d) mandates that state courts' decisions "be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455 (2005) (citations omitted). The Court now examines the claims under the above standards.

1.     *Petitioner's attorneys were constitutionally ineffective during the guilt phase of his capital trial. [Pet., Ground I]*

At the outset, Hall asserts that, despite reasons in the record for doubting the accuracy and veracity of Lead Attorney William R. Heck's testimony at the state post-conviction hearing, the state courts accredited that testimony and primarily relied on it to evaluate Hall's claims of ineffective assistance.  According to Hall, Heck had a strong incentive to testify as he did—an interest in defending billing records which were substantially at odds with the testimony of Karla Gothard, his co-counsel; Colin Mitchell, his investigator; Roger Meyer, Ph.D, his psychological expert; and John Cupp, Hamilton County Sheriff.  In asking the Court to disregard the credibility determinations of the factfinder, petitioner is seeking a reweighing of the evidence from which those credibility findings were derived.

Though the testimony of other trial participants concerning the dates and times Heck spent with them preparing the defense contradicted Heck's testimony about his billing statements is troublesome, overturning credibility determinations is not the Court's role.  *See House v. Bell*, 547 U.S. 518, 559-560 (2006) (explaining that a court deciding a summary judgment motion "does not assess credibility or weigh the evidence").  Instead, a district court's review of a state court credibility findings is circumscribed by AEDPA and deference is owed to those factual findings, unless they were derived from an unreasonable determination of the facts introduced in the state court proceeding or unless Hall offers clear and convincing evidence to rebut them.  *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility,

but on habeas review that does not suffice to supersede the trial court's credibility determination."); *Mastracchio v. Vose*, 274 F.3d 590, 598 (1st Cir. 2001) (observing that, under § 2254(e)(2), "a federal habeas court ordinarily refrains from revisiting credibility determinations as 'it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review'") (quoting *Sanna v. Dipaolo,* 265 F.3d 1, 10 (1st Cir. 2001)).  The Court will hew to those standards.

The signal case involving claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Williams v. Taylor*, 529 U.S. at 390 (*Strickland* "squarely govern[s]" such claims).  To prevail on a *Strickland* claim, petitioner must show that (1) his attorney's performance was deficient and (2) prejudicial to the defense, in that petitioner was denied a fair trial, which rendered unreliable the outcome of the trial.  *Id.* at 687-88; *see also McQueen*, 99 F.3d at 1310-11.

A deficient performance is established when it is shown that counsel's representation fell beneath an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88; *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  An attorney's conduct is not judged in hindsight, but must be evaluated for reasonableness under the circumstances existing at the time of the alleged errors.  *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311.  There is a strong presumption that counsel's conduct falls within the wide ambit of reasonable professional assistance, *Strickland*, 466 U.S. at 689; *Sims v. Livesay*, 970 F.2d 1575, 1579-80 (6th Cir. 1992), and that counsel's challenged actions might be considered sound trial

strategy. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994); *United States v. Chambers*, 944 F.2d 1253, 1272 (6th Cir. 1991) (noting that a court will not generally question matters involving trial strategy).

The inquiry does not end with proof of an attorney's sub-par performance. A petitioner must also establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As the Sixth Circuit has expressed it, prejudice is shown when a petitioner's attorney's substandard representation caused him "to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). The focus of a reviewing court is "on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 687). When the alleged attorney error occurs at sentencing, prejudice is defined somewhat differently. Under this scenario, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695.

 a. *Failure to Offer Proof of Hall's Inability to Form the Mens Rea*.

 In this claim, Hall alleges that there was available evidence which would have shown that his mental condition and mental impairments rendered him incapable of forming the requisite *mens rea*, particularly deliberation—the element of the crime which requires evidence of cool purpose formed in the absence of passion or provocation and some period

11

of reflection during which the mind is free from the influence of excitement.[3]  Though negating intent was the main defense, Heck, an experienced attorney in criminal matters, instructed Dr. Meyer, the defense's mental health expert, not to discuss with Hall the events of the night of the fire.  This led the trial court to exclude Dr. Meyer as a guilt-phase witness on the basis that his testimony was not relevant to negate intent or establish intoxication.

Additionally, Hall contends that trial counsel failed to investigate his background, his family and social history, his turbulent and violent relationship with the victim, or his long history of substance abuse leading up to the fire, so as to determine what effect those factors had on his mental state at the time of the crime.  Hall's premise is that, had this been done, evidence gleaned thereby would have led counsel to understand the unreasonableness of the decision to have Hall testify[4] and also would have allowed Dr. Meyer to perform a more comprehensive analysis of Hall's conduct on the night in question and a fuller assessment of Hall's capacity to form the intent to kill.

According to petitioner, proof adduced during the post-conviction proceedings (involving his tempestuous relationship with the victim, his family background of instability and mental illness, his long and significant history of substance abuse, his extreme emotional distress and significant impairment by drug and alcohol use at the time of the offense, and

---

[3]  The Tennessee statute under which Hall was charged defined first degree murder as an intentional, premeditated, and deliberate killing.  *See* Tenn. Code Ann. § 39-13-202(a)(1)(1991).

[4]  In state court, counsels' alleged error in calling Hall to testify was raised and discussed in a different context—as a part of the claim that the trial attorneys were ineffective for their abortive attempt to plead Hall guilty to felony murder in front of the jury.

his actions on the evening of the crime) would have supplied critical proof that his intent was to burn Ms. Crozier's car and not to kill her in the process. Further, according to petitioner, the viability of the mental health defenses — lack of capacity/ diminished capacity — is illustrated by his psychological experts' testimony at the post-conviction proceeding.

When these alleged attorney shortcomings were offered during Hall's state post-conviction proceedings, the state trial court found that counsel had made a tactical decision to instruct Dr. Meyer to refrain from discussing with Hall the events of the night of the fire. The state court observed that counsel was aware that his client had consistently admitted his guilt but also that he had given inconsistent accounts of the fire. Counsel was concerned, given the strong evidence of guilt, that any unnecessary statements Hall made during Dr. Meyer's evaluation would be subject to discovery and could be used to impeach his client's credibility.

The appellate court agreed with the lower court that the attorneys' alleged investigatory failings did not amount to a deficiency of performance. This conclusion was reached by considering the fact that counsel hired an investigator, Colin Mitchell, and that the proof showed that counsel and Mitchell had multiple conversations concerning the investigation. Furthermore, counsel discussed this case with multiple experts; met with his client on various occasions to discuss the defense; and made an effort, in the face of a very difficult set of facts, to present an adequate and successful defense.

Petitioner, in the state appellate court's opinion, had hurt his own defense by choosing to testify against his attorneys' advice and by changing his testimony at trial. Also, as a

matter of strategy not to be second-guessed, the attorneys opted not to call witnesses whose testimony they believed would be cumulative. Additionally, having observed the seeming coldness of the accused's testimony at his pretrial suppression hearing, Hall's attorneys also knew that he made a poor witness. *Hall*, 2005 WL 2008176, at*27. However, disregarding his lawyers' advice to the contrary, Hall took the stand and, as one expert witness phrased it at the post-conviction hearing, was his own worst enemy as a witness. *Id.* at *26.

Despite having found no deficient performance, the state court continued its analysis of the claimed attorney errors by examining prejudice. The state appellate court pointed out that Hall's post-conviction experts "conceded that [he] could have formed the requisite intent, and neither testified that, because of intoxication or a mental disease, [his] forming this intent was impossible. Furthermore, much of their testimony was substantially similar to Dr. Meyer's testimony." *Id.* at*27. Ultimately, the state court declined to grant relief, finding that Hall had not proven that the investigation was inadequate or that the allegedly flawed investigation had led to prejudice. *Id.* at*34.

Respondent argues that he is entitled to summary judgment because Hall cannot show that the state court's adjudication of the claim is contrary to or an unreasonable application of Supreme Court precedent. Hall's position is that counsel's decision not to investigate makes no sense and could not have been tactical or reasonable where counsel intended to use Dr. Meyer's testimony to show that, at the time of the crime, Hall did not intend to harm the victim, but intended only to set fire to her car. Hall asserts, quite convincingly, that there can be no reasonable explanation for counsel's failure to ensure the admissibility of testimony

related to the key issue in the guilt phase. Prejudice ensued, Hall argues, because a constitutionally adequate investigation would have uncovered evidence that he had not formed the requisite intent and that, while it was undisputed that he set the vehicle afire, he did not intend to kill the driver.

The state court applied *Strickland* in an objectively reasonable way in finding that counsel did not perform deficiently in investigating petitioner's background and social history. There was evidence that counsel hired an investigator to unearth Hall's background and social history; that he [counsel] had many conversations about the investigations; that counsel met with Hall and with other potential witnesses; that counsel testified that he had tried to present favorable information and exclude unfavorable information, such as Hall's sale of drugs; and that some potential witnesses told him that they would assert their Fifth Amendment rights if questioned about drugs, while others told him that they had heard Hall threaten to kill or to burn the victim. Additionally, there is evidence that family members and others were interviewed in an effort to obtain whatever information was available. Also, there was proof that the testimony of witnesses who took the stand during the post-conviction hearing but not at trial would have been cumulative to that offered at trial and also that portions of their testimony would have had a negative impact on the jury concerning Hall or his relationship with the victim.

It is questionable, however, whether the decision to instruct Dr. Meyer not to explore the details of the events surrounding the murder was objectively reasonable, given that the main —indeed, the only—defense employed at the guilt phase was to negate the elements

of premeditation and deliberation. Moreover, counsel had told the jury, in his opening statement, that the accused would testify, all but eviscerating counsel's rationale—to foreclose more inconsistent statements from his client on which the prosecution could capitalize—for issuing the questioned directive to Dr. Meyer.

Even tactical decisions have to be bottomed on a reasonable investigation. Where an attorney has made a strategic decision to pursue or not to pursue a particular trial tactic "after thorough investigation of law and facts," that decision is "virtually unchallengeable." However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91. While, "as a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference . . . there must be some limit to this deference." *Ege v. Yukins,* 485 F.3d 364, 378 (6th Cir. 2007) (citing *Strickland*, 466 U.S. at 689, and *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

Counsel precluded Dr. Meyer from questioning Hall about the murder and yet expected this expert to testify as to Hall's mental state at the time of the killing. This expert did not take the stand because his intended testimony concerning Hall's mental state at the time of the murder was not relevant. His testimony was not relevant because the expert had no knowledge about Hall's state of mind at the time of the killing. Dr. Meyer had no knowledge of Hall's mental condition at the pertinent time because he had complied with Heck's directive and had not questioned Hall concerning the facts of the murder. The Court can think of no reasonable explanation for that instruction when Attorney Heck obviously

planned to use this expert's testimony to support Hall's sole defense to the premeditated murder—that, at the time of the murder, Hall was incapable of forming premeditation or deliberation.

Indeed, when Attorney Heck was asked, during the post-conviction hearing, about preparing a mental-state defense at Hall's trial, he answered: "That is what Dr. Meyer was for" and that "what [Dr. Meyer] found . . . quite candidly, was all we had." (Addendum 6, vol. 1 at 70, 72). *See Affinito v. Hendricks*, 366 F.3d 252, 260 (3d Cir. 2004) ("When the key issue in a criminal case is whether the defendant suffered from diminished capacity, we can think of nothing more critical than ensuring that the defense's psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible. The decision not to avail [the mental health expert] of [defendant's] statements defies logic.").

Nevertheless, the Court need not make a definite ruling with respect to counsel's performance because, even assuming that the state court's finding of no deficient performance was not just incorrect, but was also an objectively unreasonable application of *Strickland*, the same is not true of the state court's finding of no prejudice. *See Strickland,* 466 U.S. at 697 (observing that a determination of whether counsel's performance was deficient is unnecessary where there is an insufficient showing of prejudice). Had Dr. Meyer testified in the guilt phase, there is no reasonable probability that his testimony would have changed the result. This is so since Hall's post-conviction experts conceded that he could have formed the necessary intent for premeditated murder in the moments preceding his

tossing of the Tupperware gas bomb into the victim's car and since they did not testify that it was impossible for him to form the requisite *mens rea* due to his level of intoxication or due to a mental disease or defect.

Moreover, there was testimony from which the jury could have drawn an inference that Hall could not have formed the necessary intent due to his intoxication. Hall spent part of the evening leading up to the crime drinking beer with two friends. The two friends testified for the defense that all three of them became intoxicated after consuming two and a half cases of beer. One of the two averred that Hall was too inebriated to drive, but that Hall declined his suggestion to spend the night and, instead, left the premises, carrying five cans of beer. Hall also testified that he purchased and drank more beer after leaving his friend's house. From this testimony, the jury could have inferred that, if Hall was intoxicated about one hour prior to the car fire and if he consumed more beers in the interim, he was in that same condition or worse at the time of the fire. Finally, Hall himself testified about his intoxication and his roiling emotional and mental state, maintaining that he intended only to burn the car and did not intend to kill the victim.

This proof was taken into consideration by the jury which concluded that it was not sufficient to negate the necessary intent and this conclusion is supported by Hall's post-conviction experts who acknowledged that he could have formed the necessary intent. Thus, Hall is unable to show prejudice. Moreover, Hall's own self-serving testimony that he only intended to burn the car demonstrates that he had the capacity to form an intent to act and the jury was free to decide, based on the overwhelming evidence of each step he took in

preparation to commit the crime, that he, in fact, was capable of forming an intent and that the intent so formed was premeditation and deliberation. Therefore, absent a showing of prejudice, the state court did not unreasonably apply *Strickland* in rejecting petitioner's claim that, in the guilt-innocence phase of his trial, his attorneys gave him ineffective assistance by failing to present proof that he was unable to premeditate and deliberate the murder.

> ### b. *Failure to obtain qualified experts to challenge the State's theory of the case.*

Hall maintains that another avenue counsel failed to pursue to negate the *mens rea* element of the first degree murder offense was to consult with an expert in fire origins and a qualified medical examiner to investigate how the fire started. The origin and progress of the fire was a crucial aspect of the state's theory of premeditation and the state's experts testified that the gas was "poured" on the victim and then ignited. Counsel's failure to consult with an expert in fire origins could have rebutted this theory by showing that a study of the physical evidence, transcripts, and statements collected by the police and fire specialists at the time of the crime demonstrates that the gas was not poured, but rather ignited, and that the tea jug containing the gas was thrown at the victim's car, as she was exiting the vehicle. This evidence would have supported a defense argument that the fire was a result of an impulsive, sudden and horrible action—not a premeditated and deliberate one—made during a time of confusion. A qualified medical examiner could have undermined the testimony of the victim's treating physician that the pattern of her burns showed that gasoline had been poured on her.

At trial, the prosecution called to the stand the victim's treating physician. She testified that, because of the victim's injuries on both the front and back of her body, it was her opinion that the victim had been doused with gasoline. Based on those injuries and the fact that the damage to the interior of the car was confined to the driver's side of the vehicle, an investigator with the state Fire Marshal's Office similarly concluded—and so testified—that the gas had been poured on the victim and ignited.

       i) <u>The fire-expert claim:</u>    Lead counsel averred, during the post-conviction hearing, that at a dinner party and, later, at a local restaurant/bar, he had spoken with Mike Mathes, a TVA engineer, concerning the fire and that, as a result of the conversation, counsel learned that the fire could not have occurred as his client had insisted that it had. Hall, however, presented an arson expert who testified at that same hearing that his analysis of the physical evidence led him to conclude that the fire could not have occurred as the prosecution described. Instead, according to this expert, the fire occurred when the victim was hit by the container of gasoline just as she was getting out of the car.

This allegation was presented to the state court, which found that counsel's failure to obtain an expert to testify that the gas was thrown rather than poured on the victim did not fall below an objective standard of reasonableness because this was not an issue prior to trial and did not become an issue until Hall began changing his story during his trial. Moreover, the state court observed that counsel's theory of the case was that Hall lacked the requisite mental state to commit first degree murder, not that he threw rather than poured gas on the victim. Too, the state court noted that the victim's own statements were that Hall threw gas

on her and that issue did not appear to be contested. Also, there was evidence presented at the trial that the gas was thrown at the victim. Thereafter, the state appeals court concluded that Hall had not proven prejudice.

The state court decision as to the fire-expert claim, respondent argues, is not contrary to or an unreasonable application of Supreme Court precedent. Hall counters that the state court's factual finding that the "poured v. thrown" imbroglio was not at issue until he began changing his story at trial was unreasonable in light of the evidence presented because counsel had a duty to investigate the issue of premeditation, including an understanding of the exact origin of the fire and that the evidence that the victim had been exiting the car when Hall threw the gasoline container at her would have supported an argument that this was an impulsive act of confusion and one which was inconsistent with premeditation and deliberation. Also, petitioner points out that since he was the last guilt-phase witness his testimony had no bearing on the prosecution's case.

Hall's arguments, in the main, are supported by the state court record. That Heck recognized that the manner in which the fire occurred was important is evidenced by his two discussions of the subject with the TVA engineer. Also, Attorney Heck submitted a statement for his work on the case which showed that, on July 4, 1991, he conferred with his client to discuss the "configuration of victim's person throughout each sequence of events from their initial meeting to his throwing gasoline into the automobile she occupied." (Addendum 6A, Ex. 11, Claim for Attorney Fee).

Eleven days later, Heck met with the Attorney General for Hamilton County and one of the prosecuting attorneys. They talked about:

> [the] subject of [the] difference in defendant['s] account of what happened as opposed to [the] account given by witnesses and what the physical evidence showed[,] contrary to [the] statement of defendant[.] [The] State's opinion [is] that gasoline [was] poured on [the] victim and that no fire bomb was used....

(*Id.*) On that same date, Heck also met with his client. The topic of discussion was "that [the] Attorney General is of [the] opinion that [Hall's] story does not coincide with [the] statements of witnesses and the physical facts." (*Id.*) Heck, seemingly, sought to clarify the discrepancy by reviewing with petitioner the facts surrounding the crime, as well as the story he recounted as to how the crime occurred. (*Id.*) Indeed, at the post-conviction hearing, Heck acknowledged that his bill reflected that in July, 1991, he "found out" that the State's theory as to how the gasoline reached Ms. Crozier's person would be that petitioner poured the gasoline over the top of her head and lit it with the cigarette lighter. Moreover, as petitioner points out in his brief, he was the last witness in the guilt-innocence stage of the trial and, hence, any changes in his testimony could not possibly have affected the presentation of the State's case-in-chief because the State rested its case before he gave that testimony. Finally, counsel's pre-trial motion for funds to hire a fire specialist signifies a belated recognition by the defense that it needed an expert to develop the issue as support for its "thrown" theory.[5]

---

[5] The Friday before trial, Heck made an in-chambers oral motion for funds to hire an arson expert, which the trial court denied due to the lack of "any showing that there was a need for that . . . ." (Addendum 2, vol. 1, Supression Hr'g Tr. at 2). And, Heck's co-counsel

The state court's opinion on post-conviction review articulates this single reason—the issue arose at trial when Hall began changing his story—as a basis for its finding no deficiency of performance on the part of counsel in failing to secure an arson expert, while noting, on direct review, that "expert testimony regarding the nature of accelerants or the paths that fires take is not uncommon." *State v. Hall*, 1996 WL 740822, at * 15 (Tenn. Crim. App. Dec. 30, 1996) (citation omitted). Therefore, the state court's finding (i.e., that the manner in which the motor fuel made contact with the victim's body was not an issue until petitioner made it so at the trial) clearly and convincingly is contravened by the record and, thus, is not entitled to a presumption of correctness. 28 U.S.C.§ 2254(e)(1).

Even though the state court's determination of "no deficient performance" was based on an incorrect factual finding and even if § 2254(d)(1)'s deferential review standards do not apply to this determination, whether Heck's failure to obtain an arson expert to contest the State's "pouring" theory amounted to a deficiency of performance need not be evaluated if any attorney error did not result in prejudice. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). After all, a claim of ineffective assistance is evaluated under a two-part test, and the state court's ultimate rejection of this claim of ineffective assistance also rests upon its finding that there was no prejudice.

---

testified at the post-conviction hearing that, during the trial itself, Heck had turned to her and said, "You know, I wish we'd thought about bringing in an arson expert." (Addendum 2, vol. 5, Karla Gothard's Test. at 670).

*Strickland*, 466 U.S. at 692 (finding that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution"). Therefore, unless the state court's finding of no prejudice resulted from an unreasonable application of *Strickland* or an unreasonable determination of the facts, then the state court's final decision as to this ineffectiveness claim may not be disturbed. *Cf. Wiggins*, 539 U.S. at 534 ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis.");

The question to be answered is whether there is a reasonable probability that, without the attorney error, the jury would have had a reasonable doubt as to Hall's guilt. *Strickland*, 466 U.S. at 695. The starting point for the prejudice analysis is to consider the totality of evidence before the factfinder, since

> [s]ome of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

In this case, defense counsel was aware that the State was espousing the "pouring" theory as opposed to the "throwing" theory well before trial but, as he testified at the post-conviction hearing:

> Well, you know, as we look at things with hindsight, you can develop a different perspective, but by the same token, at the time that all of this was going on, I didn't see – I didn't see it as – I didn't see it as that critical. I saw the photographs of the conditioning (sic) of the body, of the autopsy, I had read the medical reports. I was dealing with a case where a lady had received 96 or 97 percent third-degree burns to her entire body, to the point where Dr. Merriman had told me she couldn't give her any more morphine to help the pain subside because the pain was so intense that anymore [sic] morphine that had been given to her would have caused her to die.
> So, you know, poured or thrown, you know, how – I can understand the place that word fits in, but the results were so devastating, difficult to overcome. (Addendum 6, vol. 2, William Heck's Test. at 232).

It is true that the mental element is always at issue in a first-degree murder case and also true that pouring gasoline on a victim could be characterized as a somewhat more cold-blooded act than throwing a gas bomb into a car known to be occupied. But this is a distinction which makes little difference in view of the substantial evidence to support that the killing was premeditated and deliberate, regardless of whether the gasoline was poured or thrown on the victim.

Hall's relationship with the victim was rife with turmoil and, much to his displeasure, she had left him and moved in with her relatives. Petitioner had threatened that no one would "have" Ms. Crozier if he could not. Hall, as he averred at trial, had returned to the trailer in which he and the victim had lived, destroyed some of her belongings because he was angry with her for not coming home and for lying to him, and left their trailer, taking with him a

2-quart plastic tea jug which he meant to use in burning her car since he had been accused of that already. He then drove by numerous locations, including the factory where the victim worked and the Mathis home where she was residing, searching unsuccessfully for her car.

After being threatened by the victim's uncle and another man when he drove by the Mathis residence, Hall stopped at a service station. Hall, who by now was "pretty drunk and staggering," feigned a visit to the station's restroom to avoid a policeman who drove into the station. Hall also purchased a cigarette lighter and gasoline, filled the container with gasoline, gathered paper towers from a dispenser, stuffed them into the opening of the container, put the container in the floorboard of his car, and returned to the area near the Mathis house. As petitioner was leaving the area, he encountered the victim driving by in her car, stopped to talk to her, and asked her to move back in with him—a request which she (inferentially) refused. They conversed and soon began to argue.

Hall then instructed Ms. Crozier to get out of the car because he was going to burn it. He grabbed her keys when she tried to lock the door and drive off. He threw them towards his automobile, again directing her to get out of the car. He rushed to his car, and grabbed the jug of gasoline from the floorboard of his vehicle and the lighter from the front seat. He then ignited the paper towels, ran to the doorframe of the victim's car, told her again to get out, and, with full knowledge that the victim, at that exact moment, was lying across the front seat sobbing, threw the blazing container into the driver's side of the car and saw it "blow[] all on her." (Addendum 2, vol. 8 at 1073). Hall then drove off.

This sequence of events, as testified to by petitioner, provides overwhelming evidence that he was capable of forming the requisite intent. Hall engaged in multi-step activity, including collecting the components of the gas bomb—plastic jug, gasoline, paper towels with which to fashion a wick, and a cigarette lighter. Hall testified that he told the victim that he loved and needed her, that he asked her to come home with him, and that, in response to his entreaties, she called him a "crazy s.o.b." and told him to "turn [him]self in and get [] some help." (*Id*. at 1073-74). Hall stated that he then became angry and told the victim to get out of the car and that he was going to burn it.

Up to this point, Hall's actions are consistent with an intent to burn the car, an intent to burn the victim, or both. However, the proof offered though Hall's testimony was that he was running towards Ms. Crozier's vehicle carrying the flaming container, that he saw her "still laying there between the seats crying," and that, despite this knowledge, he threw the lit container of gasoline into the vehicle anyway. (*Id*. at 1077). This is strong evidence of an intentional, premeditated and deliberate murder. As the Tennessee Supreme Court observed, Hall's "relentless determination to commit the arson of the victim's car ultimately culminated in his decision to kill her." *Hall*, 958 S.W.2d at 678. If petitioner intended only to burn the car, he could have accomplished his goal by waiting until the victim returned home and the car was unoccupied. By acknowledging that he planned to burn Ms. Crozier's automobile, Hall necessarily admitted that he had the capacity to form a specific intent, i.e., to burn the victim's car. Hall's stormy relationship with the victim and his conduct

immediately preceding, during, and after the fire provide strong support for a finding that the intent so formed was not only to burn the vehicle but also to kill the victim.

The failure to obtain an arson expert to investigate the circumstances of the fire and to testify that the gasoline was thrown, not poured, did not prejudice the defense so as to render the trial unfair and the result unreliable. *Strickland*, 466 U.S. at 693. True, expert testimony as to the origin of the fire, perhaps, would have undermined the prosecution's theory that the gasoline was poured on the victim and would have substantiated Hall's testimony that he ignited and threw the jug of gasoline and the victim's testimony that a gas bomb was thrown on her. But "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . [or] that the errors impaired the presentation of the defense." *Id.* at 694 (internal quotation marks omitted). Even so, Hall has not borne his burden of showing that there is a reasonable likelihood that, but for counsel's failure to consult and present the testimony of a fire expert to support the pouring scenario, the state court decision would have been different.

Thus, the state court did not apply *Strickland* to the facts of Hall's case in an objectively unreasonable manner in concluding that there was no prejudice ensuing from counsel's failure to secure the services of a fire science expert to support the hypothesis that throwing the gas bomb was an impulsive act which occurred amidst a dispute with the victim and not an intentional, premeditated, and deliberate killing.

   ii)   The medical-examiner claim:   At trial, Dr. Sonya June Merriman, the victim's treating physician—and plastic surgery resident—testified that the consistency of

the burn on the victim's body was more in keeping with the gasoline having been doused on the victim rather than splattered on her. During the post-conviction proceedings in the lower state court, petitioner asserted that Dr. Merriman's opinion that the gasoline had been doused on the victim exceeded the scope of her expertise and that his attorneys should have objected that she lacked the qualifications to render this opinion.

To support this claim, Dr. Frank King, a forensic pathologist who served as the Hamilton County medical examiner, was called to testify at the post-conviction hearing. Dr. King stated that, while he would agree that dousing (i.e., pouring gasoline directly on the body) was more likely to achieve the serious burn to the victim's body than splattering (i.e., splashing a specific part of the body with a much smaller amount of gasoline), he could not prove it either way from the pattern of the burn injury on the victim because her burns were so extensive that there simply was no pattern to interpret. Dr. James Metcalfe, the forensic pathologist who had performed the autopsy on the victim while substituting for the vacationing Dr. King, was also called to testify. This expert was somewhat equivocal as to the manner in which the gasoline arrived in the vehicle, though he would "lean somewhat toward it being thrown." (Addendum 6, James Metcalfe's Test. at 104). However, the state post-conviction court did not credit his opinion because Dr. Metcalfe "could not say for sure whether the gas had been poured or thrown." *Hall v. State*, 2005 WL 2008176, at *18.

Respondent argues that counsel's failure to secure the services of a medical examiner was not an issue addressed in the state court's opinion during the post-conviction appeal because that issue was not raised in Hall's appeal brief. This, respondent maintains,

constitutes a procedural default since a habeas claim must be supported by the same facts and legal theories as were offered to support it in the state court and since this claim was not so presented. Hall disagrees, suggesting that he raised the issue on pages 50 - 56 in his brief on the post-conviction appeal.

The Court has reviewed the sections of the brief to which Hall refers. The sections containing the cited material are entitled, "Defense counsel failed to object to state experts' qualifications" and "State experts' lack of qualifications is exemplified through incomplete use of facts to support their posited theory." As petitioner correctly points out, written in this section are these two factual allegations: "Defense counsel neglected to use the opinion of Dr. King or any qualified forensic pathologist at trial" and "defense counsel failed to call Dr. Metcalfe, the pathologist that conducted the autopsy on [the victim's] body."

Nevertheless, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, *Anderson v. Harless,* 459 U.S. 4, 6 (1982), nor that the issues were related. *Lott v. Coyle*, 261 F.3d 594, 607, 619 (6th Cir. 2001). Embedding assertions that counsel failed to obtain the testimony of a medical examiner in a claim that the attorneys failed to challenge the testimony of the treating physician is not a fair presentation of the issue to the state courts and did not give the Tennessee courts a "full and fair" opportunity to address the claim of ineffective assistance of counsel presented here. *See O'Sullivan*, 526 U.S. at 845 ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts

one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

The claim of ineffective assistance raised in the state appellate court focused on counsel's shortcomings in failing to challenge the testifying state expert's qualifications, whereas the claim raised here concerns counsel's failure to obtain a defense forensic pathologist to testify. Challenging the qualifications of an opponent's expert is a different action on the part of a defense attorney from the action required to obtain an expert to testify for the defense. *See Brandon v. Stone*, 226 Fed.Appx. 458, 460, 2007 WL 786330, *1 (6th Cir. Mar. 15, 2007) (citing *Carver v. Straub*, 349 F.3d 340, 346-47 (6th Cir. 2003)). Thus, by failing to present the state courts with the same claim raised here and by failing to show cause and prejudice for that failure, Hall has procedurally defaulted his medical-examiner claim. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (holding that a claim was procedurally defaulted because it "rest[ed] on a theory which is separate and distinct from the one previously considered and rejected in the state court").

Alternatively, if counsel's failure to obtain a medical examiner was fairly presented to, duly considered by, and not procedurally defaulted in the state courts, Hall would have to show that the state courts' rejection of the claim of ineffective assistance was an unreasonable application of *Strickland*. That rejection, so explained the state courts, rested on certain circumstances, such as counsel's testimony that he believed Dr. Merriman to be qualified to give an opinion as to whether the gasoline had been doused or poured, that he believed that this opinion was within her area of expertise, that the victim received third-

degree burns to 96-97 percent of her body, and that the true focus of the trial was not whether the gasoline was splattered or doused, but whether Hall had the requisite mental state for premeditated murder when he splattered or doused gasoline on the victim. Holding that this theory of defense was a viable one, the state court concluded that petitioner had failed to show ineffective assistance (presumably referring to the deficient-performance prong of *Strickland*) or prejudice.

If, as Hall charges, the reliability of Dr. Merriman's opinion as to the dousing of gasoline could have been seriously undermined had counsel consulted with a qualified pathologist with respect to this issue, the Court concludes that such competing testimony would not have changed the existing evidence. To review that evidence: (1) the gasoline (whether doused or thrown) had resulted in second- and third-degree burns to 96 to 97 percent of the victim's body, (2) Hall admittedly was the one who had thrown or doused the victim with gasoline, the one who had engaged in the actions to which he testified and from which inferences were drawn as to his state of mind at the moment the gasoline left his control by whatever delivery method he chose, and (3) there was proof that the gasoline was thrown because both the victim and Hall had said so and because they were the only two people present when the fire originated. Thus, regardless of whether the gasoline was doused or thrown, the proof of premeditation is overwhelming and Hall cannot show prejudice.

Counsel's failure to secure a medical examiner for the purpose so stated did not prejudice Hall since it did not deprive him of a fair trial, a trial whose result is reliable. And

absent a showing of prejudice, the state court did not unreasonably apply *Strickland* in rejecting this particular ineffectiveness claim. No writ will issue with respect to this claim.

### c. Counsel failed to inform Hall of the consequences of pleading guilty to felony murder before attempting to enter such a plea in front of the jury.

Petitioner was indicted for first degree murder by an intentional, premeditated, and deliberate killing, first degree murder by a reckless killing committed during the perpetration of arson (felony murder), and aggravated arson. After the reading of the indictment but prior to the swearing of the jury, Hall attempted to plead guilty to felony murder and aggravated arson on the advice of his attorneys. Because Hall was facing the death penalty upon conviction for first degree murder, his attorneys hoped to mitigate his responsibility for the crime and spare him the death penalty. The plea was rejected, however, because Hall's testimony that he believed that entry of the plea would allow the case to go directly to sentencing persuaded the trial court that the plea was not made with a full understanding of its ramifications. The case proceeded to trial and the jury found petitioner guilty of first degree premeditated murder and sentenced him to execution.

Hall now claims that the plan to have him plead guilty in front of the jury and then, inexplicably, go to trial illustrates the lack of preparation on the part of defense counsel. According to Hall, the attempt to enter the plea was a spur-of-the-moment decision to follow a strategy which was inadequately considered and investigated and is illustrative of counsel's desperate, last-minute search for a defense plan.

The trial record shows that, during the attempted plea entry, Hall testified that his attorneys had engaged in lengthy, numerous conversations with him concerning the possibility of entering a plea of guilty to all or some of the charges and that, the prior afternoon, had discussed their recommendation to plead guilty in considerable detail. (Addendum 2, vol. 7 at 759). At the post-conviction hearing, Attorney Heck pointed out that the acceptance of Hall's plea to felony murder would have removed proof relative to that charge from evidence to be adduced at the jury trial. (Addendum 6, vol. 2 at 257-58, 296 ). Heck further testified that he had advised Hall to plead guilty in front of the jury to show the jury that his client was accepting responsibility and accountability for the crime—one which it would have been impossible to prove had been committed by someone else. *(Id.* at 296).

Co-counsel Gothard, who by her own admission was opposed to the death penalty, testified to similar reasons for their decision, but added that, while both attorneys discussed the plea with Hall, the plea attempt was made on short notice and that they, due to time constraints, were unable to make sure that he understood the plea. Gothard averred that she had not researched the issue, though the plea was her idea, and did not know whether relevant case law existed. Further, Hall's second-chair attorney testified that she had drawn on ten years of legal experience and forty-seven years of life experience—talking to people and studying human behavior and human nature—in recommending the plea. She had thought this strategy would be effective "[b]ecause it's a person standing up and accepting responsibility." (*Id.* at 618-19). Finally, she stated that she believed, at the time, that it was a good strategy, though she had since learned at death penalty conferences that she was

wrong in her belief because a plea erases the best mitigating evidence a defendant can offer in the penalty phase (i.e., "lingering doubt"as to a defendant's guilt).  (*Id*. at 619, 622-24).

The trial court denied Hall relief.  He then carried the issue to the Court of Criminal Appeals.  In entertaining this claim, the lower appellate state court observed that it was uncertain as to whether the strategy behind the plea would have been successful or whether Hall's attorneys had explained the plea to him.  The state appellate court also related that, even though Hall had expressed confusion on the stand during his effort to enter the guilty plea, the post-conviction court had found credible counsel's testimony that he had explained to his client the consequences of pleading guilty.  The Court of Criminal Appeals, at the same time, considered and found correct Hall's contention that, by pleading guilty to aggravated arson, he was admitting the existence of one of the two aggravating factors found in his case (that the murder was committed during the course of a felony, to wit, aggravated arson).

Even so, it was clear to the state appeals court, as it had been to Hall's attorneys, that the felony-murder aggravator would have been proven at trial.  Finding that the strategy underlying the attempted guilty plea was to garner some sympathy or empathy for Hall with the jury by having him take responsibility for the arson and to boost his credibility by having him admit that he started the fire (which also was certain to be proven anyway) in an effort to have the jury believe that he did not intend to kill the victim might have been a potentially flawed action in hindsight.  However, the state court declined to engage in hindsight in order to find a deficiency of performance involving the attempted plea, the strategy of entering the

plea to mitigate the sentence, or the attempt to submit the plea in front of the jury, since the jury was responsible for sentencing Hall.

Nor did the state court find prejudice. Hall's theory of defense was that, even though he started the fire that burned the victim's car and caused her death, he did not intend to kill the victim and, therefore, did not have the requisite *mens rea* for first degree premeditated murder. Pointing out that Hall testified to these facts at trial, the state court found that his attempt to plead guilty to aggravated arson and felony murder did not contravene his trial strategy or his trial testimony, so that any error on the part of his attorneys was not prejudicial to the defense.

According to petitioner, the state court decision resulted from an unreasonable application of *Strickland*, because the relevant question is not whether counsel's decisions are strategic, as the state court would have it, but whether they are reasonable. However, each of these three subjects is pertinent in determining Hall's entitlement to relief. "Whether the state court reasonably determined that there was a strategic decision under § 2254(d)(2) is a different question from whether the strategic decision itself was a reasonable exercise of professional judgment under *Strickland* or whether the application of *Strickland* was reasonable under § 2254(d)(1)." *Wood v. Allen*, 130 S. Ct. 841, 851 (2010). *See also Wiggins*, 539 U.S. at 523 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*") (citing *Strickland*, 466 U.S. at 691) (italics in original); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). In Hall's view, it was not reasonable for counsel to recommend that he plead

guilty to felony murder and aggravated arson before performing critical legal research concerning the plea and ascertaining that his client understood what he was doing. Lastly, Hall argues that the decision was based upon unreasonable findings of fact in light of the evidence presented in state court.

i) <u>Lack of Legal Research</u>: Hall first argues that counsel failed to perform critical legal research before advising him to plead guilty to the felony murder charge. "A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (citing *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir. 1991)). Nonetheless, Hall does not indicate what additional research should have been done or how information gleaned from that research would have impacted counsel's advice to plead guilty.

Indeed, Attorney Heck testified that he had investigated the facts underlying the criminal accusations against petitioner, knew the governing law, read capital-case litigation manuals, and attended seminars on death penalty defense. Moreover, Co-counsel Gothard testified that, among other sources, she drew on her legal and life experience in reaching the decision to advise Hall to plead guilty. The Supreme Court has recognized that the best method of advancing a client's interests "frequently involves highly practical considerations as well as specialized knowledge of the law." *Tollett v. Henderson*, 411 U.S. 258, 268 (1973).

ii) <u>Understanding the Plea Consequences</u>: Hall suggests, and second chair counsel so testified, that the decision to recommend a guilty plea was made on short notice, without adequate time to prepare him to plead and to make sure that he understood his plea. The Court of Criminal Appeals read the record as failing to disclose clearly whether Hall's attorneys explained the plea to him, but the lower appellate state court relied, at the same time, on the post-conviction court's credibility finding that counsel had informed his client as to the consequences of the pleas.

A review of the "abortive guilty plea" section of the transcript demonstrates Hall's confusion concerning his pleas. Devoting the time necessary to explain to Hall the plea and its consequences to make sure that he understood these matters was particularly important, given evidence of Hall's intellectual deficits and impulsiveness. *See Hall v. State*, 2005 WL 2008176, at * 9 (Heck, in his testimony at the post-conviction hearing, described his client as having "extremely marginal intellect" and being "incapable of really any self-control," according to background research).

iii) <u>Unreasonable Factfindings</u>: Hall's final argument involves a challenge to the state court's findings of fact. However, because he has not identified any specific factual finding pertinent to this issue which was incorrect nor offered clear and convincing evidence to refute any fact(s) found by the state court, the Court will presume that the factual determinations of the state court are correct. 28 U.S.C. § 2254(e)(1). If petitioner's true challenge is to the state court's finding that Heck testified credibly at the post-conviction

hearing, that issue was addressed previously in this opinion. Moreover, the Court lacks the authority under habeas corpus jurisprudence to re-weigh that evidence.

iv) <u>Unreasonable Application of *Strickland*</u>: During Hall's post-conviction case, his attorneys advanced reasons for recommending that he plead guilty to aggravated arson and felony murder. One reason so proffered by his lawyers was to show the jury that their client accepted responsibility for the crime, which they anticipated might benefit him when the jury considered his sentence. These defense attorneys' perception that a jury might react favorably to Hall's acknowledgment of guilt, given the overwhelming evidence of guilt, is a sensible basis for advising him to enter his plea. *Tollett*, 411 U.S. at 268 (noting that "the convincing nature of the evidence against the accused [is a] consideration[] that might suggest the advisability of a guilty plea"); *Card v. Dugger*, 911 F.2d 1494, 1511 (11th Cir. 1990) (finding that "counsel's sense of the reaction of the jury to certain types of testimony presents a sound basis on which to make tactical decisions"). The fact that the trial court rejected Hall's pleas to felony murder and aggravated arson does not indicate that the recommendation to plead was objectively unreasonable. *Tollett*, 411 U.S. at 268 ("Often the interests of the accused are not advanced by . . . contesting all guilt . . . .") (citing *Santobello v. New York*, 404 U.S. 257 (1971)).

Moreover, Hall's lawyers stated that they recommended the pleas as a means to limit proof of the aggravated arson and felony murder to be placed in front of the jury. True, co-counsel changed her opinion as to the advisability of having Hall plead guilty in the first place and of having him do so in front of the jury in the second place. But, she testified that

her revised opinion was prompted by training, data, and information in the death penalty arena which she had received after the challenged decision was made. Unlike the second chair attorney, this Court recognizes, as did the state court, that an alleged attorney error may not be viewed in hindsight and that any purported shortcoming must be evaluated under the circumstances which existed at the time of the plea attempt.

Even if the Court agrees with Hall that counsels' advice to enter the pleas and to do so in front of the jury was inadequately researched, ill-considered or erroneous and that it amounted to a deficient performance, that is still insufficient under 28 U.S.C. § 2254(d), which requires that the state court decision be *unreasonable*, not just incorrect. *See Barrow v. Uchtman,* 398 F.3d 597, 602 (7th Cir. 2005) ("This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect."). *See also Wood*, 130 S. Ct. at 850-51 ("Reviewing all of the evidence, we agree with the State that even if it is debatable, it is not unreasonable to conclude that . . . counsel made a strategic decision. . . .").

Given the "wide range of reasonable professional assistance" within which counsel's questioned conduct is presumed to fall, *Strickland*, 466 U.S. at 689, the horrifying nature of the prosecution's evidence, and counsels' testimony as to the reasons for advising Hall to plead guilty, this Court concludes that the state court did not unreasonably apply *Strickland* in finding no deficiency of performance. *See Wong v. Belmontes*, 130 S.Ct. 383, 385 (2009) ("At all points, '[j]udicial scrutiny of counsel's performance must be highly deferential.'")

(quoting *Strickland*, 466 U.S. at 689). By the same token, since the attempt to plead was consonant with Hall's plan of defense—not to contest the aggravated arson or felony murder charges, but instead, to prove that Hall lacked the requisite *mens rea* for a premeditated murder—and his trial testimony, the state court's decision with respect to prejudice was not an unreasonable application of *Strickland* either. The writ of habeas corpus cannot be based on this alleged instance of ineffective assistance. *See Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.") (citing *Yarborough,* 541 U.S. at 664).

   d. *Counsel failed to competently select a jury, and therefore deprived Mr. Hall of his constitutional right to a fair and impartial jury.*

   In this claim, Hall maintains that his attorneys gave him ineffective assistance in three instances while choosing a jury. One purported attorney error was committed during the jury *voir dire* when a juror, Dianna Jones, gave unclear answers as to whether there might be circumstances under which she would be unable to consider a life sentence. A second such error occurred, Hall charges, when Cynthia Taylor, another juror, indicated that she would consider a life sentence only if it could be "proven." According to petitioner, counsel failed to ask follow-up questions in order to life-qualify those two jurors whose responses were problematical. A third juror, Evelyn Taylor, was dismissed immediately after she voiced opposition to the death penalty. Counsels' claimed error in this regard was in failing to

ascertain prior to her dismissal whether she would automatically vote against the death penalty, was constitutionally qualified, would weigh mitigating evidence, or understood the appropriate burden of proof.

When these purported attorney failings were raised during the post-conviction proceedings, the trial court held that the record disclosed that the appropriate legal standards were properly applied during the selection process of all three jurors and that Hall had failed to demonstrate either deficient performance or resulting prejudice. *Hall v. State*, 2005 WL 2008176, at *35. The claim was offered to the Court of Criminal Appeals, which resolved it as follows:

> [P]etitioner has not made the trial transcript part of the appellate record. When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. Generally, when the appellate record is inadequate, the appellate court is precluded from considering the issue, and the trial court's ruling is presumed correct. Without the transcript of the voir dire proceedings, we must presume that the post-conviction court's ruling was supported by the evidence. Accordingly, we conclude, as did the post-conviction court, that Counsel was not ineffective for failing to conduct an adequate voir dire, and we hold that the Petitioner is not entitled to relief on this issue.

*Id.* at *35 (all citations and internal quotation marks omitted).

Respondent argues that the above-cited section of the state appellate court's opinion reflects that the state court found that the claim had been waived due to Hall's failure to submit the *voir dire* transcript and that this finding constitutes a procedural default. Hall, citing to *James v. Brigano*, 470 F.3d 636 (6th Cir. 2006), has a different point of view,

suggesting that the state court did not enforce its procedural rule, but resolved the issue on the merits.[6] Hall offers the more persuasive argument.

In *James*, the petitioner had failed to present on direct appeal two federal claims. The first claim was that, before removing his appointed counsel from his case, the state trial court failed to inquire into the reasons for his dissatisfaction with his attorney and the second was that he had not knowingly and intelligently waived counsel. When these claims were offered later in an application to reopen the appeal, the state appellate court rejected James's application, but disposed of the claims on the merits rather than on a procedural basis. As to the first claim, the state court held that, "[b]ased on the . . . record, we find that James failed to meet the burden of announcing grounds that would entitle him to discharge his counsel," and "because James failed to meet his burden . . . the trial court had no duty of inquiry." *Id.* at 641 (citation omitted).

As to the second claim, the state appellate court found that the claim did not involve a waiver of counsel and it therefore proceeded to analyze the claim as though James had been engaging in dilatory tactics. *Ibid.* Pointing out that the state court's opinion did not frame its rejection of James's underlying claims on procedural grounds, but instead rebuffed the

---

[6] Petitioner's suggestion that the state court did not enforce the procedural rule is a reference to the second prong of the Sixth Circuit's test for determining whether a procedural default exists. Under *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986), such a default exists only if: (1) there is an applicable state procedural rule with which petitioner failed to comply, (2) the state court enforced its procedural sanction, (3) the procedural rule constitutes an "adequate and independent" ground to foreclose federal review, and (4) no cause and prejudice has been shown. *Id*. at 138.

claims on their merits, the Sixth Circuit concluded that, because the state court did not rely on a procedural rule in disposing of the claims, there was no procedural default.

So it is here. In Tennessee, a defendant is required to prepare a record that conveys a fair, accurate, and complete account of what occurred with respect to the issues which form the basis of his appeal. Tenn. R. App. P. 24(b). If the record contains nothing to support a claim of error, then that alleged error will not be considered on appeal. *Jackson v. State,* 539 S.W.2d 337 (Tenn. Crim. App. 1976); *State v. Meeks,* 779 S.W.2d 394 (Tenn. Crim. App. 1988) (finding that the failure to provide a transcript of a sentencing hearing constitutes a waiver of the sentencing issue). Thus, there was a state court rule with which Hall failed to comply.

Even though Hall failed to supply the Court of Criminal Appeals with the required 734-page *voir dire* transcript, the intermediate state appellate court did not enforce the waiver rule, but instead presumed correct the trial court's ruling, which limited, but did not foreclose consideration of the claim. It thereafter concluded, as had the trial court, that Hall's attorney had not given him ineffective assistance during the jury *voir dire*.

"[W]here the state courts do not rely on independent state grounds for disposing of a claim and instead reach the merits of a federal question, the federal question is properly before [a federal habeas court]." *Wainwright v. Witt*, 469 U.S. 412, 431 n.11 (1985). Instructive in this regard is *County Court of Ulster County, N. Y. v. Allen*, 442 U.S. 140 (1979). There, the Supreme Court stated that the trial court ruled on the merits, that it was

not authorized to do so unless the issue was preserved for appeal, and that, by doing so, the trial court implicitly decided that there was no procedural default. *Id.* at 152-53.

Here, the post-conviction court ruled on the merits of Hall's ineffectiveness claim. Tennessee law, which controls the scope of review, expressly prohibits post-conviction consideration of issues deemed waived. *See State v. West*, 19 S.W.3d 753, 754 (Tenn. 2000). And here, as in *Allen*, the Court of Criminal Appeals implicitly decided that there was no procedural bar to consideration of the claim. "[I]f neither the state legislature nor the state courts indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *Allen*, 442 U.S. at 154; *Melchior v. Jago*, 723 F.2d 486, 490 (6th Cir. 1983) (finding no procedural default where a state appellate court does not rely on a procedural bar, but reaches the merits of the federal claim). While the state court opinion "unquestionably mentions [the state procedural rule] and its requirements, . . . [i]t is unclear on what ground, or grounds, the court's judgment rested." *Clinkscale v. Carter*, 375 F.3d 430, 442 (6th Cir. 2004), *cert. den.*, 543 U.S. 1177 (2005). Thus, Hall did not commit a procedural default and federal review remains available for his claim. *See Sanders v. Cotton*, 398 F.3d 572, 579-80 (7th Cir. 2005) (no procedural default where state court referred to the state's waiver rule, but did not follow that reference with a conclusion such as "and [petitioner's] claims are waived under that standard" and the state court "immediately proceeded to address and decide the merits").

Since the state appellate court presumed correct the rulings of the post-conviction court in reaching its decision, the Court must examine the inferior state court's decision to resolve the federal claim. The lower state court stated:

> Specifically, [the p]etitioner claims that [c]ounsel was ineffective in failing to object to the excusal of juror Evelyn Taylor, who was opposed to the death penalty, and in failing to exclude jurors Dianne M. Jones and Cynthia Taylor, whose opinions would lead them not to listen to and give effect to mitigating evidence. The record, however, establishes that this court properly applied the appropriate legal standards during the jury selection process of these questioned individuals.

> After throughly reviewing the record, this court finds that the [p]etitioner has failed to establish either ineffective assistance of counsel or prejudice on this issue.

*Hall v. State*, 2005 WL 2008176, at *35.

In its brief review of this claim, the state post-conviction court did not cite to any Supreme Court precedent regarding its "jury selection" conclusion or enunciate the legal principles upon which it relied. Even though the state court offered scant explanation for its decision regarding petitioner's challenge to the jurors in the context of his claim of ineffective assistance, the deferential standards of § 2254(d) still apply and relief will depend upon whether the state court's legal conclusion was contrary to or an unreasonable application of the governing legal rule in Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (AEDPA deference "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [such] cases, so long as neither the reasoning nor result of the state court decision contradicts them."); *accord Harris v. Stovall*, 212 F.3d 940, 943 n. 1 (6th Cir. 2000) ("Where a state court decides a constitutional issue

. . . without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standard articulated" in AEDPA), *cert. den.*, 532 U.S. 947 (2001).

Thus, the state court's ruling must not be upset unless an independent review of the record and the relevant principle in Supreme Court cases persuades this Court that the ruling contravenes or unreasonably applies the controlling legal rule or results from an unreasonable factual determination in light of the evidence offered to the state court. *Id*. at 943; *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006).

A defendant's jury trial right guarantees an accused a fair trial by a panel of impartial, "indifferent" jurors, *Irvin v. Dowd*, 366 U.S. 717 (1961), and jurors may not be excluded merely "because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). Death qualification of a jury does not violate the constitutional right to an impartial jury because an impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts. *Lockhart v. McCree*, 476 U.S. 162, 177-78 (1986). A state court's decision to exclude a juror because of her views on capital punishment is a factual determination which is entitled to deference, subject to be overturned only if there is no fair support for the ruling in the record. *Witt*, 469 U.S. at 426-31. The question under *Witherspoon* and *Witt* is whether the jury that is actually empaneled is impartial. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988).

The Court has reviewed the *voir dire* transcript involving the trial court's questioning of the three challenged jurors and sees nothing constitutionally impermissible in the trial court's inquiries. Indeed, Hall has not alleged that the trial court did anything improper or that it did not apply the controlling legal standards during the *voir dire* of these three jurors. Instead, petitioner attributes the unconstitutional conduct to his attorney. The Court will examine each claim of attorney error individually.

i) <u>Error No. 1</u>: During defense's *voir dire* questioning of Dianna Jones, Juror Number 43, (Addendum 2, vol. 4 at 415-18), Heck asked if there were any types of facts or crime that she thought would be so bad that those facts could prevent her from considering a life sentence as punishment. She responded: "Just been(sic) blowed (sic) away, shot in the head." (*Id.* at 416) Though Hall does not specify which part of the questions presented to Ms. Jones forms the basis for his ineffectiveness claim, the Court infers that her "shot-in-the-head" answer triggered this claim, given his citation to the page of the *voir dire* transcript which contains that response. Relying on *Morgan v. Illinois*, 504 U.S. 719 (1992), Hall submits that this juror's answers were unclear as to whether there were circumstances under which she would be unable to consider a life sentence.

According to the transcript, immediately following the above-cited response, defense counsel inquired:

> "If a crime involved a lot of pain, if it involves someone burning to death, would that have any effect on you in terms of your ability to render a fair and impartial verdict . . . [and] given those facts as I described to you briefly, would that cause you to not be able to consider giving life as a

sentence . . . [and] would (sic) automatically require you to give the death penalty?" (Addendum 2, vol. 4 at 416-17.)

When Ms. Jones asked counsel to repeat the question, he explained:

> "What I am trying to find out, ma'am, is if you --- if there are any circumstances in your mind, or any facts about a case, this case in particular, that would cause you to be unable to consider life as a sentence. And what I was asking is that if the case, as this case, involves someone who was burned to death, would that kind of fact automatically exclude life as a possible sentence in your mind, or could you still follow the charge of the Court and consider both life and death by electrocution?" (*Id.* at 417.)

When she answered, "Yes," counsel followed up with a clarifying question, asking her if she could follow the instructions of the Court. She again answered, "Yes." *(Id.* at 417-18.)

In the case cited by petitioner, the Supreme Court established the rule that, to ensure an impartial jury, a capital defendant who so requests must be permitted to inquire into whether a juror would automatically vote for the death penalty upon conviction and to challenge that juror for cause. *Morgan*, 504 U.S. at 729 - 30. Applying *Morgan* to this case, not only was counsel not prevented from asking life-qualifying questions of Ms. Jones, he in fact asked such questions. And he made follow-up inquiries of Ms. Jones which indicated that, even under the grim facts of Hall's case, she would not automatically vote to impose the death sentence if he were convicted, but would hew to the instructions of the Court as to what she should consider in determining the punishment. Counsel did not let this juror's vague reply pass unnoticed, but continued his inquiry until he, seemingly, was assured by her responses that she would not be a death-prone juror, but instead, an impartial one.

Finally, petitioner was convicted in March of 1992 and sentenced the next month and on June 15, 1992, the Supreme Court issued its *Morgan* decision. Until that time, there was no established right to pose a life-qualifying question to a juror, and even after *Morgan*, the right was only triggered if counsel asked to make such an inquiry. An attorney's failure to anticipate later legal developments generally does not amount to ineffective assistance. *See Green v. United States,* 65 F.3d 546, 551 (6th Cir. 1995); *Alcorn v. Smith*, 781 F.2d 58, 62 (6th Cir. 1986). And no prejudice occurs unless counsel's alleged deficient performance deprived petitioner of a "substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993). In the instant case, because Hall has failed to show that Juror Jones's views "prevent[ed] or substantially impair[ed] the performance of [her] duties as a juror, in accordance with the [trial court's] instructions and [her] oath," *Witt*, 469 U.S. at 424-25, and, alternatively, because the *Morgan* rule was not in existence when the alleged error occurred, petitioner has failed to demonstrate that he suffered any prejudice as a result of counsel's alleged error.

      ii) <u>Error No. 2</u>: During *voir dire* questioning, Heck asked Juror No. 45, Cynthia Taylor, whether, "after hearing the proof in the case and the Judge explains to you what aggravating and mitigating factors are . . . if you felt that the proof warranted a life sentence, would you have any problem giving a life sentence?" She replied, "No, if they — it can be proven." (Addendum 2, vol. 4 at 430). Counsel then asked Ms. Taylor whether she could follow the law as instructed by the Court in arriving at a sentence and she gave a positive response. Counsel next inquired as to whether there were any facts so grave (using

the Jeffrey Dahmer case as an example)[7] that they would cause her to impose a death penalty automatically, without heeding the Court's instructions as to what she must consider and she answered, "No." (*Id.* at 431).

Hall argues that Juror Taylor's first answer signified that she misunderstood the burden of proof and that, by failing to correct this misconception, counsel left the impression that death was presumed unless the defendant proved otherwise.  However, "[t]here is no constitutionally required script for *voir dire*," *Morgan*, 504 U.S. at 729, and "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorney would not defend any particular client the same way." *Strickland*, 466 U.S. at 689.

Though petitioner might have preferred that counsel straightaway correct this juror's supposed misunderstanding of the burden of proof, presumably by instructing her as to the correct constitutional standard, counsel chose another method.  By his inquiries to Ms. Taylor, Heck emphasized that the judge would give instructions on what to consider in reaching the sentencing decision and he determined, based on her responses, that she would render her decision based on those instructions, which were constitutionally required to contain a charge on the proper burden of proof and the identity of the party who carried that burden.

---

[7] Jeffrey Dahmer was a serial murderer who dismembered his victims and preserved some of their body parts or entire skeletons.  *See Weinberger v. State of Wis.*, 906 F. Supp. 485, 490 (W.D.Wis. 1995). (Weinberger, the father of one of the victims, filed a civil suit against the State of Wisconsin, where Dahmer lived when he was arrested.)

"An attorney's actions during *voir dire* are considered to be matters of trial strategy [and] [a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997)). The above-cited section of the transcript reflecting Heck's *voir dire* of Juror No. 45 reveals that counsel did not allow a problematic response to slide by without further questioning to determine whether this juror would "take the law from the court, and apply that law to the facts as [she found] them to be from the evidence." *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005) (quoting *Sparf v. United States,* 156 U.S. 51, 102 (1895)). This Court will not second guess counsel's strategic choice and does not find either a deficiency of performance or prejudice.

   iii) <u>Error No. 3:</u> In conducting the *voir dire* of Juror Number 36, Evelyn Taylor (Addendum 2, vol. 4 at 354-57), the trial court told her that there were two parts of the trial—a guilt phase and a sentencing phase—and that if, in the first part, the jury found Hall guilty of first degree murder, the jury would determine, in the second part, the appropriate sentence. That sentence, the court explained, would be either life imprisonment or death by electrocution. The court asked Juror No. 36 whether she could consider both punishments. This juror replied that she had reservations about electrocution, but that she could consider life. The trial court restated the initial information, and indicated that, if she were selected as a juror and if she found Hall guilty of first degree murder, she would have to consider as a possible punishment both life imprisonment and death by electrocution and

would have to sign her name to a paper signifying her decision as to the penalty. The court then queried, "Do you think you could do that?" Ms. Tayor replied, "I don't think I could sign the death (sic)." (*Id*. at 356). The trial court probed further into the issue and this juror responded "I just don't think I could do that to anyone" and again "I don't think I could." (*Id.* at 356-57).

Following the prosecution's questioning of this juror, Co-counsel Gothard engaged in extensive *voir dire*, eliciting responses indicating that Ms. Taylor would consider the law and the two alternative punishments. (*Id*. at 358-63). However, when the prosecutor again questioned Ms. Taylor as to whether she could impose the death penalty, she replied that she did not think she could. The prosecutor next inquired as to whether she had a moral inability to impose a death penalty, and Ms. Taylor responded that she did have and that she just could not impose a death sentence. The trial court then excused this juror for cause. (*Id.* at 363).

Hall does not allege, and has not shown, that the jury which was selected was not impartial. *Hill v. Brigano,* 199 F.3d 833, 844 (6th Cir.1999) ("It is not enough for the defendant to show that the decision to exclude the two jurors was improper. He also must show that the jury selected was biased."). Moreover, as the Court's synopsis of the *voir dire* of this juror indicates, Co-counsel Gothard did all she could to rehabilitate Ms. Taylor and to qualify her as a juror. The fact that she was unsuccessful in her rehabilitative attempt does not mean that Attorney Gothard's questioning of the juror amounted to a constitutional error.

This Court agrees with the trial court's finding that it's handling of the jury *voir dire* accorded with the pertinent constitutional principles and that counsel did not render

ineffective assistance in this process. By the same token, the state courts which reviewed this issue did not unreasonably apply *Strickland* in deciding that Hall's attorneys did not conduct an inadequate *voir dire* and did not render ineffective assistance.

>    *e. Counsel were ineffective when they failed to object to erroneous and unconstitutional jury instructions.*

In this claim, Hall maintains that the trial court impermissibly instructed the jury in three areas: (1) on the "heinous, atrocious and cruel" [hereinafter HAC] aggravating circumstance; (2) on reasonable doubt at both phases of the trial; and (3) on the mandatory death penalty. According to petitioner, counsel should have objected, but failed to object, to these improper instructions and this failing demonstrates that he was given ineffective assistance.

When this claim was offered to the state appellate court, it resolved the claim in reliance on state cases which had rejected the contention that the HAC aggravating circumstance is overly broad (citing to *Terry v. State*, 46 S.W.3d 147 (Tenn. 2001)); which had rejected challenges to the constitutionality of the reasonable doubt instruction (citing to, *inter alia*, *Nichols v. State*, 877 S.W.2d 722, 734 (Tenn. 1994), *cert. den.*, 513 U.S. 1114 (1995)); and which had approved the use of mandatory statutory sentencing schemes about which the jury in Hall's case was instructed (citing to *State v. Bane*, 853 S.W.2d 483 (Tenn. 1993)). These state court cases, in turn, relied on decisions by federal courts, including the United States Supreme Court, which had construed the constitutionality of similar instructions or statutes. In accordance with those decisions, the Court of Criminal Appeals

found that Hall had failed to prove that his attorneys gave him ineffective assistance (referring to *Strickland*'s deficient-performance prong) or that he was prejudiced by their failure to challenge these three jury instructions.

Respondent argues that summary judgment is warranted on the "jury instructions" ineffectiveness claim because Hall has failed to show that the state court decision on that claim is contrary to or an unreasonable application of Supreme Court precedent. Hall disagrees for the reasons which follow.

   i) <u>Instructions on the HAC Aggravator</u>: During the penalty phase, the trial judge gave to the jury the following instructions on the aggravating factor in Tenn. Code. Ann. § 39-13-204(i)(5) (1990):

> (2) the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death.

The trial judge also defined those statutory terms, in accordance with the limiting construction set forth by the state supreme court in *State v. Williams,* 690 S.W.2d 517, 529 (Tenn. 1985). More specifically, the trial court charged:

> "Heinous" means grossly wicked or reprehensible; abominable; odious; vile. "Atrocious" means extremely evil or cruel; monstrous; exceptionally bad; abominable. "Cruel" means disposed to inflict pain or suffering; causing suffering; painful. "Torture" means the infliction of severe physical or mental pain while he or she remains alive and conscious." (Addendum 2, vol. 12 at 1562-63).

Hall maintains that the HAC aggravating factor is impermissibly broad and vague and fails to narrow the population of death-eligible defendants. As authority for his challenge to this aggravating factor, Hall cites to *Godfrey v. Georgia*, 446 U.S. 420 (1980), which held,

with respect to an "outrageously or wantonly vile, horrible or inhuman" aggravating circumstance that "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence," *id.* at 428, and to *Maynard v. Cartwright*, 486 U.S. 356 (1988). *Cartwright*, as the Supreme Court later explained, approved a narrowing construction of the HAC aggravator—one which limited its application "to killings in which the victim sustained 'torture or serious physical abuse' prior to the murder"). *Bell v. Cone*, 543 U.S. 447, 459 (2005) (citing *Cartwright*, 486 U.S. at 364-65).

Unlike the Georgia state court in *Godfrey*, the Tennessee Supreme Court has placed a limiting construction on this aggravating factor, defining each term in the statute according to its ordinary and natural meaning. *Williams*, 690 S.W.2d at 527-30. The definitions given to Hall's jury were similar to the limiting language approved of in *Cartwright*. "We also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." *Cartwright,* 486 U.S. at 364-65. Because the "especially heinous, atrocious, or cruel" language was circumscribed by telling the jury the definition of each word and by requiring that the murder involve torture (which was also defined) or serious physical injury beyond that necessary to produce death, the instruction ensured that Hall's capital sentence was not arbitrarily and capriciously inflicted by an unguided jury which did not know what it must find to impose that penalty.

Petitioner has not shown that the state court's decision with respect to the HAC aggravating factor is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[8]  Therefore, counsel could not have rendered a prejudicial performance by failing to challenge a jury charge which was not impermissible and the state courts did not unreasonably apply *Strickland* in finding that counsel did not give ineffective assistance by failing to object to that instruction.

ii)  <u>Instructions on Reasonable Doubt</u>:     Hall claims that his attorneys gave him ineffective assistance by failing to object to reasonable doubt instructions at both phases of his trial and that the instructions reduced the State's constitutional burden of proof and, thereby, violated his due process rights.  Hall has raised a separate claim based on the reasonable doubt instructions themselves [Claim VII] and has incorporated the arguments supporting that claim into the instant claim.

The trial court charged Hall's jury during the guilt-innocence stage of the trial, using the following instructions:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in each case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt.  Reasonable doubt does not mean a capricious, possible or imaginary doubt.  Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.  (Addendum 2, vol. 8 at 1170).

---

[8] In fact, in *Bell v. Cone*, *supra*, the Supreme Court determined that a Tennessee court decision affirming a death sentence based on the HAC aggravating circumstance in the predecessor statute was not contrary to clearly established Supreme Court precedent.

The instructions on reasonable doubt at the penalty phase were essentially the same, though minor alterations were made to the guilt-phase instructions to tailor them to the sentencing phase. (*Id.*, vol.12 at 1570).

Hall argues that these instructions violate due process because they permitted the jury to convict on something less than the degree of proof encompassed by the "beyond a reasonable doubt" standard that the Constitution requires for a conviction. More specifically, citing to *Cage v. Louisiana*, 498 U.S. 39 (1990), petitioner suggests that the term "moral certainty" used in describing reasonable doubt would be understood so differently from the "evidentiary certainty" of a proper reasonable doubt instruction as to deny him due process. While Hall recognizes that the instructions concerning this phrase were upheld subsequently in *Victor v. Nebraska*, 511 U.S. 1 (1994), he maintains that the instructions given to his jury, unlike those given in *Victor*, did not define "moral certainty" in terms of the evidence and, thus, unlike those used in *Victor*, were not given meaning in the context of the instructions as a whole.

When this ineffectiveness claim was carried to the Court of Criminal Appeals, it stated that the Tennessee Supreme Court has rejected arguments regarding the constitutionality of the reasonable doubt instructions, and that, in accordance with those decisions, Hall had not proven that his attorneys were ineffective (again, referring to the deficient performance part of *Strickland*'s test) or that he suffered any resulting prejudice. As observed before, the lack of any specific citation to a Supreme Court case in the state court's opinion means that this

Court must independently review the record and the law to determine whether the state court, in the results it reached, unreasonably applied the relevant precedent.

In *Cage*, an instruction equating reasonable doubt with "grave uncertainty" or "actual substantial doubt" and requiring "moral certainty" instead of "evidentiary certainty" was found by the United States Supreme Court to be unconstitutional. The reasoning underlying *Cage* is that, when those definitions of reasonable doubt accompany an instruction that conviction is appropriate upon the jury's "moral certainty" of guilt, then a jury might impermissibly convict on less proof than required under the due process clause. In *Victor*, the Supreme Court limited *Cage*, finding that a jury instruction that a reasonable doubt was not "a mere possible doubt" did not violate due process because, in another phrase, it made it clear that everything is open to some possible or imaginary doubt. *Victor,* 511 U.S. at 5. The Court also held that the Constitution does not command that any "particular form of words" be used in instructing the jury as to the burden of proof and that the phrase "moral certainty" is constitutionally acceptable where the rest of the instruction "lends content to the phrase." *Id.* at 5 and 14.

To be granted a writ of habeas corpus, petitioner must show that his jury was given instructions that were not only erroneous, but when viewed in the context of the whole charge, so infirm that they rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). An instruction which is ambiguous, but not necessarily erroneous, violates due process only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Id.* at 72, 73 n. 4.

The instructions given to Hall's jury are almost identical to those found permissible in *Austin v. Bell,* 126 F.3d 843 (6th Cir. 1997), *cert. den.,* 523 U.S. 1079 (1998). The *Austin* court stated that the phrase "inability to let the mind rest easily" lends content to the phrase "moral certainty," that this language was more like that approved in *Victor* than that found constitutionally impermissible in *Cage*, that the phrasing of the instruction increased, "if anything, the prosecutor's burden of proof," and that there was no reasonable likelihood that the jury applied the instruction in a way that lowered the State's burden of proof. *Id.* at 847.

Therefore, because the challenged instructions have passed constitutional muster and because petitioner points to no Supreme Court case which holds to the contrary, counsel's failure to object to the reasonable doubt instructions did not fall outside the wide range of competent assistance nor prejudice the defense. Hence, the state court did not unreasonably apply *Strickland* or other relevant rules in Supreme Court precedent in so finding. Accordingly, habeas relief is not warranted with respect to this alleged attorney error, either.

        iii) Instructions on Mandatory Death Penalty Statute:    The trial judge gave the following instructions under Tenn. Code Ann. 39-13-204(g):

> If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt, and said circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt, the sentence shall be death. (Addendum No. 2, vol. 12 at 1567).

Petitioner asserts that, based on the instruction, the prosecutor argued that the jury had "to do what the law says to do" and had to discount mercy and sympathy. He further asserts that

his lawyers were ineffective for not challenging these instructions and the argument by the prosecution that the death penalty is mandatory under certain circumstances.

The Court of Criminal Appeals briefly considered the questioned jury instructions. The state appellate court first observed that the instructions given by the trial court made use of the mandatory statutory sentencing scheme approved of by the highest state court. It then determined that, in harmony with those decisions, Hall had not shown that counsel's failure to object to those instructions amounted to ineffective assistance.

It is Hall's position that the state appeals court's finding of no ineffective assistance based on counsel's failure to challenge this jury charge is an unreasonable application of federal law and is based on unreasonable factual determinations. Respondent argues that, given the proof before the state court, Hall cannot show that the state court's decision merits relief under the AEDPA's standards of review. The Court agrees that, in reaching its decision, the state court did not unreasonably apply the clearly established federal law set forth in Supreme Court precedent.

In *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), the Supreme Court upheld this aspect of a state's death penalty scheme:

> [The death penalty statute] does not limit the types of mitigating evidence which may be considered, and [one] subsection . . . provides a jury with a nonexclusive list of mitigating factors which may be taken into account- including a catchall category providing for the consideration of [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. Nor is the statute impermissibly mandatory. . . . . Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in

the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. This is sufficient . . . .

*Id.* at 305 (citations, footnote, and all internal quotation marks omitted). *See also Boyde v. California,* 494 U.S. 370, 376-78 (1990) (finding no constitutional requirement that a jury have unfettered sentencing discretion and approving an instruction that the jury "shall" impose death if it finds that aggravating circumstances outweigh mitigating circumstances).

And in a later decision, *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court summed up the law with respect to this issue:

So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death. Indeed, *Walton [v. Arizona*, 497 U.S. 639, 652 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002))] suggested that the only capital sentencing systems that would be impermissibly mandatory were those that would automatically impose death upon conviction for certain types of murder.

*Id.* at 171 (quotation marks and some internal citations omitted).

The Tennessee death penalty statute allows each individual juror to determine the existence of a mitigating factor, *Abdur'Rahman v. Bell*, 226 F.3d 696, 711-12 (6th Cir. 2000), and leaves the jury free to decide on the weight to be given aggravating factors and mitigating factors. *State v. Bland*, 957 S.W.2d 651, 661 (Tenn. 1997), *cert. den.*, 523 U.S. 1083 (1998). Also, Tennessee's death penalty scheme has been found constitutionally sufficient by the Sixth Circuit. *Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998).

Petitioner has not cited to a Supreme Court case which holds that the questioned instructions given to his jury are unconstitutional. Obviously, counsel does not provide

ineffective assistance by failing to object to jury instructions which are not improper. Therefore, Hall has not shown that the state court's disposition of his ineffective assistance claim is an objectively unreasonable application of *Strickland*, and he is not entitled to relief with respect to this claim.

2. *Lee Hall's conviction and death sentence must be set aside because the Tennessee death penalty scheme violates the United States Constitution.  (Pet., Ground IX).*

Petitioner charges that Tennessee's death penalty system and its application, as interpreted by the state courts, violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  He claims that it does so in two principal ways—aggravating factors do not perform a narrowing function and the death penalty is imposed capriciously and arbitrarily.

*a.  Aggravating circumstances do not narrow the class of death-eligible defendants.*

Hall maintains that several of Tennessee's statutory aggravating circumstances have been so broadly and disparately interpreted that they fail to provide a meaningful basis for narrowing the population of those convicted of first degree murder to those few eligible for the sentence of death.  Each argument will be addressed in turn.

i) The Tenn.Code Ann. § 39-13-204(i)(2) circumstance [i.e., that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person] has been construed and applied in an overbroad manner.

In state court, Hall argued that the combination of the (i)(2), (i)(5), (i)(6), and (i)(7) aggravators encompass a majority of the homicides committed in Tennessee.  Raising the

(i)(2) aggravating factor as an independent claim in a habeas petition is not the same as asserting that *four* aggravators, *in combination*, are so broad as to include most of those who commit homicides. By failing to offer the habeas claim to the state courts on the same legal and factual basis, Hall has committed a procedural default, which can be overcome only upon a showing of cause and prejudice. Neither showing has been made.

But if there is no procedural default, the Supreme Court has explained that "[a]n aggravating factor can be overbroad if the sentencing jury 'fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty.'" *Jones v. United States*, 527 U.S. 373, 401 (1999) (citing *Arave v. Creech*, 507 U.S. 463, 474 (1993)) (emphasis in original). Clearly, the (i)(2) aggravator does not meet this definition because the sentencing jury could not conclude that it applies to every defendant since not all defendants have a prior criminal history. That factor does not apply and has not applied to all death-eligible defendants, *see, West v. Bell,* 550 F.3d 542 (6th Cir. 2008); *see also Harbison v. Bell*, 408 F.3d 823 (6th Cir. 2005), and no sentencing jury "fairly could conclude" that it does. Indeed, that factor did not even apply to Hall. This claim has no merit.

      ii) The Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance[ i.e., that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant] has been construed and applied in such a manner as to be duplicative of the (i)(7) aggravating circumstance [i.e., that the murder was committed while the defendant was engaged in committing or attempting to commit arson].

On direct review, Hall contended that the (i)(6) "avoid arrest" circumstance duplicated the (i)(7) "felony murder" circumstance. Reasoning that the jury rejected the (i)(6) factor and that, under state law, the finding of the (i)(7) factor was proper in a premeditated first degree murder, the Court of Criminal Appeals found that the claim had no merit.

Citing to *Tuilaepa v. California*, 512 U.S. 967, 973 (1994), and *Arave*, 507 U.S. at 472 for the respective rules that aggravating circumstances must contain "a common-sense core of meaning . . . criminal juries should be capable of understanding" and, generally, should avoid the use of "pejorative adjectives . . . that describe a crime as a whole or language which invites the jury to make an evaluative judgment on the relative horror of one murder over another," the Sixth Circuit has found Tennessee's (i)(6) avoid-arrest factor to be facially constitutional. *Carter v. Bell*, 218 F.3d 581, 608 (6th Cir. 2000) (internal quotation marks omitted). Obviously, since the jury rejected the (i)(6) factor in his case, petitioner has no "as applied" argument or one on duplicity.

Nonetheless, if the Tennessee court's ruling could be interpreted as addressing petitioner's duplicity argument, he could not show an entitlement to relief because, in the Supreme Court's own words:

> We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory . . . . What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an *invalid* factor. Petitioner's argument . . . would have us reach a quite different proposition-that if two aggravating factors are "*duplicativ*e," then the weighing process necessarily is skewed, and the factors are therefore invalid.

*Jones*, 527 U.S. at 398 (emphasis added, citations and footnote omitted).

Since there is no Supreme Court precedent which establishes the rule advanced by Hall, he has not shown and cannot show that the state court's rejection of his "duplicity" claim was contrary to or an unreasonable application of well established Supreme Court precedent.

      iii) <u>The Tenn Code. Ann. § 39-13-204(i)(5) aggravating circumstance [i.e., that the murder was especially heinous, atrocious, and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death] is vague and overbroad.</u>

Petitioner presented his challenge to the HAC aggravator in the state appellate court. The Court of Criminal Appeals, citing to state court cases, resolved the issue by pointing out that the state supreme court had rejected those contentions with respect to the former version of the factor and that it [the Court of Criminal Appeals] had rejected the contention with regard to the current version. The state court did not grant Hall any relief.

Petitioner has cited to no Supreme Court case to demonstrate that the state court's decision is contrary to or an unreasonable application of the well established legal rule in that precedent. *See Thaler v. Haynes*, ___ S. Ct. ___, ___, 2010 WL 596511, *3 (Feb. 22,2010) ("A legal principle is "clearly established" within the meaning of [28 U.S.C. § 2254(d)(1)] only when it is embodied in a holding of [the Supreme Court]. And it is unlikely that he could satisfy the "contrary to" provision because, as observed earlier in this opinion, the Supreme Court has upheld a Tennessee court decision affirming a death sentence based on the HAC aggravating circumstance, finding that it was not contrary to clearly established Supreme Court precedent. *Bell v. Cone*, 543 U.S. at 456-60. No relief is warranted with regard to this claim.

iv) <u>In combination, subsections (i)(5) [HAC aggravator], (i)(6) [avoid-arrest aggravator], and (i)(7) [felony-murder aggravator] encompass most homicides committed in Tennessee.</u>

In state court, petitioner argued that the statute was too inclusive of violent offenders and did not narrow the class of potential capital defendants. The Court of Criminal Appeals stated that the (i)(2) "prior violent felony" circumstance and the (i)(6) "avoid arrest" circumstance did not pertain to Hall's case, that the (i)(2) factor was not relied upon by the prosecution, and that the (i)(6) aggravator was rejected by the jury.[9] Finding nothing in the record to support petitioner's argument, the state court determined that the claim had no merit.

This claim is based upon the constitutional principle that a capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (internal quotation marks omitted); *accord, Buchanan v. Angelone*, 522 U.S. 269, 275 (1998). This means that "the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa,*, 512 U.S. at 972-73. "If the sentencer fairly could conclude that an aggravating circumstance applies to

---

[9] Though omitted from the federal claim, Hall's claim in state court, as noted, also included the (i)(2) "prior violent felony" factor. (Addendum 4, Doc. 4, Pet'r's App. Br. at 120).

*every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave,* 507 U.S. 474 (italics in original).

The state appellate court's finding that there was no supporting evidence is bolstered by Hall's admission in his appellate brief that he lacked the resources to investigate and provide the statistical evidence to prove his claim. (Addendum 4, Doc. 4, Pet'r's App. Br. at 120). The Court of Criminal Appeal's other factual findings likewise are sustained by the record. No clear and convincing evidence has been offered to refute those findings and the Court presumes them to be correct.

Under 28 U.S.C. § 2244(d), unless the state court's decision is contrary to or an unreasonable application of the well established governing legal rule in a Supreme Court case, it must remain undisturbed. Because petitioner has submitted nothing to satisfy this test, the writ will not issue with respect to this claim.

*b. The Death Penalty is imposed capriciously and arbitrarily.*

Hall's next sub-claim is that provisions of Tennessee's state death penalty statute and its other criminal laws have resulted in the arbitrary and capricious infliction of the death penalty and that death sentences in this State are imposed for improper, illegal and unconstitutional reasons. The state death penalty process, according to Hall, is constitutionally deficient because it:

1)  gives the prosecutor unlimited discretion as to whether or not to seek the death penalty;

2)  imposes death sentences in a discriminatory fashion, based on race, gender, and crime locale;

3) lacks uniform standards or procedures for jury selection to ensue an open inquiry;

4) uses a death-qualification process which results in a prosecutorial-oriented and death-prone jury;

5) prohibits discussion of matters such as the cost of incarceration versus cost of execution, potential deterrence, the method of execution, and parole ineligibility;

6) requires the jury to agree unanimously on a life verdict in violation of *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990);

7) fails to instruct the jury on the meaning and function of mitigating circumstances which creates a reasonable likelihood that jurors believe they must unanimously agree as to the existence of such circumstances;

8) does not require the jury to make the ultimate determination that death is the appropriate penalty;

9) denies defendant the final closing argument in the sentencing phase;

10) permits depressed and mentally-ill defendants to waive presentation of available mitigation and to preclude attorneys from presenting such evidence to the jury and the appellate courts for proportionality review; and

11) mandates introduction of victim-impact and other-crime evidence upon the State's request, which violates the separation of powers doctrine and injects arbitrariness into capital sentencing in violation of due process and equal protection of the law.

Respondent argues that, to the extent that Hall offers new factual predicates in support of the claim, they are barred by procedural default and that, as to the claims adjudicated by the state court, he has failed to show that the disposition of those claims warrants relief under the deferential review standards in § 2254(d). Petitioner counters that the issues and factual predications were presented to the appellate court and that no claims have been procedurally defaulted. Notably, he does not contest respondent's "deferential review" argument.

Hall raised ten arguments in state court to support his claim that the death penalty statute was arbitrary and capricious and he has brought to this Court seven of those arguments (1, 3-5, and 7-9) and four new or remodeled arguments (2, 6, 10, and 11). The four arguments not presented to the state court on the same legal and factual bases have been procedurally defaulted and, since nothing by way of cause or prejudice has been offered, federal review is now foreclosed as to these particular arguments.

On direct review, Hall asserted the remaining aspects of his claim that the death penalty procedure is capricious and arbitrary. The Court of Criminal Appeals first noted that there was nothing in the record to support his claim that the death penalty was arbitrarily imposed. It then rejected each sub-claim, pointing out that those issues had been previously addressed and rejected by the state supreme court.

> Relative to the defendant's first argument that prosecutors have unlimited discretion as to whether to seek the death penalty in a given case, our supreme court has held that opportunities for discretionary action that inhere in the processing of a murder case, including the authority of the prosecutor to select those persons whom he or she wishes to prosecute for a capital offense, do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty freakish or arbitrary. This issue is without merit.

> Third,[10] the defendant argues that the death penalty statute has been imposed discriminatorily on the basis of economics, race, gender and geographic region in the state. This argument has been rejected by the supreme court. Moreover, the record is devoid of evidence indicative of an individualized

---

[10] The second issue was based on the state constitution and has not been offered as a habeas claim.

showing of improper discrimination with regard to the sentencing of the defendant in this case.

Fourth, the defendant submits that the failure to create a uniform system of jury selection results in unequal treatment for capital defendants and necessarily results in arbitrary and capricious imposition of the death penalty. Specifically, the defendant contends that all capital defendants should be guaranteed individual sequestered voir dire and a questioning process which would maximize the prospective jurors' candor.

Our supreme court has rejected the argument that the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition of the death penalty arbitrary and capricious. . . . Further, the court has said that the "ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court."  In this case, the defendant has not challenged any of the jurors selected or the manner in which the trial court conducted voir dire.  This issue is without merit.

Fifth, the defendant argues that the manner of selecting "death qualified" jurors results in juries that are prone to conviction. . . . [H]owever, our supreme court stated that "[t]his argument has been rejected by both the Tennessee and United States Supreme Court.  The defendant has not offered any evidence in which to substantiate his claim, nor has he presented a principled basis with which to distinguish the supreme court holdings in this area.

Sixth, the defendant contends that capital defendants should be allowed to address jurors' popular "misconceptions" concerning parole eligibility, the cost of incarceration versus the cost of execution, general deterrence, and the method of execution in order to avoid arbitrary decision making.  This argument, however, has been rejected on several occasions by our supreme court.  Moreover, the defendant did not present any evidence with respect to his contentions.

As his seventh argument, the defendant submits that it is constitutional error to instruct juries that they must agree unanimously in order to impose a life sentence and to prohibit juries from being told the effect of a nonunanimous verdict.  However, this contention also has been repeatedly rejected by the supreme court.

Relative to this issue, the defendant contends that requiring the jury to agree unanimously to a life verdict violates the holding in *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The claim has been held to be without merit under Tennessee law. [In a prior case], the court noted that *McKoy* and *Mills* stand for the principle that any requirement that the jury must unanimously find a mitigating circumstance before it can be considered violates the Eighth Amendment. The court went on to state that the unanimous *verdict* instruction does not violate these principles. In any event, the trial court in the present case instructed the jury that there was no requirement for jury unanimity or agreement as to any particular mitigator. Also, it followed with instructions for each juror to decide the case individually and for each to know that they were *not* required to reach a unanimous verdict regarding mitigators or their weight. Thus, the concerns expressed in *McKoy* and *Mills* are not present in this case.

Eighth, the defendant argues that the Tennessee Pattern Jury Instructions create a reasonable likelihood that jurors are led to believe they must unanimously agree on the existence of any mitigating factors. The supreme court has repeatedly rejected this argument. Moreover, the trial court instructed the jury that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." It is a well-established rule in Tennessee that a jury is presumed to have followed the instructions of the trial court.

Ninth, the defendant claims that the statute fails to require that the jury make the ultimate determination of whether death is the appropriate penalty in a specific case. This argument has likewise been rejected by the supreme court. The defendant's claim that there is no weighing process for aggravating and mitigating factors is also without merit. In[a prior case], the supreme court said that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required."

As his tenth and final argument in support of his contention that the death penalty is imposed arbitrarily and capriciously in Tennessee, the defendant contends that once an aggravating circumstance is proven, the burden of proof shifts to the defendant to present mitigating evidence. Therefore, the defendant argues, it is constitutional error to deny the defense the right to give the final closing argument in the penalty phase. This issue has been rejected by the supreme court on numerous occasions. In [a prior case], the court said that the "order [of argument] is not inherently prejudicial to the defendant or

favorable to the state in its use at the sentencing stage of a death penalty proceeding."

*State v. Hall*, 1996 WL 740822, at* 30 -*32 (Tenn. Crim. App. Dec. 30, 1996) (some internal citations omitted).

In reaching its decision, the state appeals court cited to several Supreme Court cases in addition to *McKoy* and *Mills*.  Those include:  *McCleskey v. Kemp*, 481 U.S. 279 (1987), *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Furman v. Georgia*, 408 U.S. 238 (1972).  In *Furman,* a case Hall cited here and in his state appellate brief also, the Supreme Court found that giving juries unlimited discretion resulted in the wanton and freakish imposition of the death penalty and, thereby, violated the Constitution.

In *Gregg,* the Supreme Court explained:

The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily.  Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant.  Left unguided, juries imposed the death sentence in a way that could only be called freakish.  The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death.  In this way the jury's discretion is channeled.  No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.  In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here.

*Id.* at 206-07.

The Supreme Court then rejected the argument that a capital sentencing scheme was unconstitutional based on the state prosecutor's "unfettered authority to select those persons whom he wishes to prosecute for a capital offense." *Id.* at 199. Likewise, it has also rejected the suggestion that the Constitution requires that a jury be instructed as to what weight to give the sentencing phase evidence on aggravating or mitigating circumstances, *Zant v. Stephens*, 462 U.S. 862, 879-80 (1983), and the argument that statistical disparities in death penalty cases prove discrimination, without a showing of improper discrimination against the defendant in his particular case. *McCleskey*, 481 U.S. at 292-93.

The Court concludes that, since the factual claims not offered to the state courts are procedurally defaulted and since Hall has not pointed to the rule in a Supreme Court case to justify a finding that the state court decision on the issues which were adjudicated is contrary to or an reasonable application of the well established controlling rule, this claim does not entitle Hall to relief.

3.    *Petitioner's right to due process was violated when the State introduced evidence of prior bad acts and when the trial court instructed the jury that premeditation and deliberation can be achieved in an instant. The combined effect of these errors prejudiced Mr. Hall's right to a fair trial.*[11]  *[Pet., Ground III]*

a. *Bad-Acts Evidence*.

Petitioner was indicted for arson of the victim's car on April 1st and 6th of 1991, but these charges were severed from the murder and aggravated arson charges. However,

---

[11] In the body of Claim III, Hall also challenges the "heat of passion" instruction. The "heat of passion" and "combined effect" subclaims are addressed later in this opinion under the "Procedurally Defaulted Claims" category.

witnesses at the trial testified that Hall was the culprit in those incidents. Hall argues that the identity of the perpetrator is the primary justification for the admission of prior bad acts of a defendant, but that, in his case, he admitted that he set the fire on April 17th. Therefore, Hall asserts that, because identity was established as to the charges being tried, identity necessarily was excluded as a triable issue. Thus, according to petitioner's lights, evidence of the previous vehicle fires was not relevant to any matter actually at issue in his trial, was highly prejudicial, and should have been excluded by the trial court. He further charges that admission of this evidence not only violated state law, but also denied him constitutional due process.

This claim was offered to both state appellate courts. As it did with respect to other claims, the Tennessee Supreme Court stated that, as to issues raised and not addressed in its opinion, it affirmed the Court of Criminal Appeals' decision and it attached the lower court's opinion to its own. Tennessee's lower appellate court, despite observing that the record was missing a pattern of clear-cut testimony, objections, and rulings with respect to the prior fires, determined that the evidence was relevant to Hall's motive and intent and, therefore, was admissible.

A state court's rulings on the admission of evidence are only cognizable as habeas corpus claims if they violate a defendant's due process right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Patterson v. New York*, 432 U.S. 197, 202 (1977) (To rise to the level of a due process violation, a state-court evidentiary ruling must "offend . . . some

principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.").

Though the state court did not address Hall's constitutional due process arguments, Hall was not denied a fair trial by the introduction of this evidence. The record supports that the evidence was relevant and admissible. Hall had committed the prior acts of arson towards the victim and charges had been brought. He was aware of the charges. Motive and intent to commit the murder could be inferred from the previous fires to the victim's car. There was no question as to who was responsible for the April 17th arson of the victim's car because Hall admitted that he did it. His whole defense to the murder charge was that he intended to burn the victim's vehicle but did not intend to kill her. And conceivably, evidence of the prior fires could have been beneficial to the defense, as well as detrimental. This evidence might have bolstered the credibility of petitioner's defense that his sole intent on April 17th, when he searched for the victim, was to burn her car, since he had tried to do just that twice before.

At any rate, the Court sees no violation of due process by the admission of the evidence because it did not result in fundamental unfairness. *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) ("Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."). And the state court's finding that the evidence was admissible must remain undisturbed because "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by

permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (declining to decide whether the introduction of a evidence of similar "other bad acts" violates due process).

    b.   *Jury instruction on Premeditation & Deliberation.*

    The trial court instructed the jury, in relevant part:

> Premeditation means that the intent to kill must have been formed prior to the act itself. *Such intent to kill may be conceived and deliberately formed in an instant* . . . . If the design to kill was formed with deliberation and premeditation, *it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect.* (Addendum 2, vol. 8 at 1182-83) (emphasis added).

Citing to *State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992), and *State v. Brooks*, 880 S.W.2d 390, 393 (Tenn. Crim. App. 1993), petitioner alleges that the italicized instructions were found objectionable by state courts prior to the time his case became final on appeal. Hall further asserts that the State capitalized on these misleading instructions in its argument and that the instructions and the argument by the prosecution prejudiced the jury's consideration of his defense that he had no deliberate, premeditated plan to kill the victim.

    These instructions were challenged on direct appeal, and the Court of Criminal Appeals found that the jury had been properly instructed on the separate elements of intent, premeditation, and deliberation. It further found that, while *Brown* had deemed the "formed in an instant" instruction on premeditation potentially confusing and prudent to abandon, the *Brown* rule was not a constitutional rule and did not apply retroactively. Alternatively, the

lower state appellate court also may have found harmless error by agreeing with the State's argument "that, in any event, there was sufficient evidence of premeditation and deliberation in this case to render any error harmless."

In his brief to the Court of Criminal Appeals, Hall attacked the jury instructions on premeditation and deliberation as a violation of state law, not as a denial of his constitutional right to a fair trial. (Addendum 4, Doc. 1 at 39-41). To exhaust a constitutional claim, it must be presented to the state courts as a violation of federal law, not merely one of state law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *Koontz v. Glossa,* 731 F.2d 365, 368 (6th Cir. 1984)). Therefore, Hall's failure to offer the issue as a constitutional violation in the state court constitutes a procedural default.

Alternatively, assuming that this claim was not procedurally defaulted, it is also respondent's position that the state court's rejection of the instructions claim does not meet the strictures of § 2254(d) and also that the claim is *Teague*-barred. The retroactivity argument must be addressed first.

*Teague v. Lane*, 489 U.S. 288 (1989), holds that, generally, new constitutional rules of criminal procedure do not apply to cases which have become final before the new rules are announced. *Id.* at 310. This Court is aware of no authority finding that the questioned jury instructions are constitutionally prohibited and, if the Court were to so find, this would constitute a new rule. However, "[a] new rule of constitutional law should not be applied on collateral review in a federal *habeas corpus* case unless to do so would satisfy the narrow exceptions of decriminalizing a class of conduct or prohibit infliction of capital punishment

on a particular class of persons, or devising a new rule which is a 'watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.'" *Carter,* 218 F.3d at 604 (citing *Saffle v. Parks,* 494 U.S. 484, 485 (1990)). None of these exceptions apply.

Secondly, even here, the instructions claim is not supported by relevant Supreme Court citations or developed argument. Merely alleging that the instruction violated Hall's constitutional right to a fair trial is conclusory. Even if this claim were factually fleshed out, and if there is a federal issue hiding out somewhere in this jury instructions claim, Hall has not pointed to a Supreme Court case to show that the state court's rejection of the claim runs amiss of § 2254(d)'s standards. Hall is not entitled to relief with regard to this claim.

4. *Petitioner's death sentence violates his right to due process, grand jury indictment, and a finding by the jury that the aggravating factors were proven beyond a reasonable doubt pursuant to the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution under the principles announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). [Pet., Ground IV]*

Petitioner was charged with a capital offense in an indictment which did not include the aggravating circumstances upon which the State intended to rely to support its request for a death sentence. Nevertheless, at the trial, the prosecution presented to the jury certain aggravating circumstances to support a sentence of death; the petit jury found two of those circumstances and sentenced petitioner to death. Hall maintains that, by failing to plead those aggravating circumstances in the indictment, the State violated his right to have the jury find facts which increased his sentence from life imprisonment to death.

79

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Ring v. Arizona*, 536 U.S. 584 (2002), the defendant was found guilty of first degree murder and the trial judge imposed a capital sentence under the then-existing Arizona sentencing statute, which assigned to the trial judge, rather than to the jury, the task of determining the presence of aggravating factors which made a defendant eligible for the death penalty. The Supreme Court held that *Apprendi* required that the existence of an aggravating factor be proven to a jury, rather than to a judge. *Id.* at 603-09.

Hall presented this claim in his post-conviction appeal, and the Tennessee Court of Criminal Appeals concluded "that the State is not required to include the aggravating circumstances in the indictment," and that he "had adequate notice that the State intended to seek the death penalty." *Hall,* 2005 WL 2008176, at*38. It thereafter denied relief on the claim. Respondent argues that the state court's decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and that, since it has long been held that the federal right to presentment or indictment by a grand jury does not extend to the States under the Fourteenth Amendment, to grant relief on this claim would violate the retroactivity doctrine in *Teague*. Hall replies that his federal right to due process hinges on

a state constitutional right to presentment or indictment by a grand jury and that a state which elects to act in a field where its action has significant discretionary elements must nonetheless act in accord with the federal Constitution. Hall also argues that the Tennessee courts unreasonably apply *Ring* in finding that aggravating circumstances need not be alleged in the indictment.

Respondent makes the better argument. Hall has not cited to Supreme Court authority which supports his position or undermines the state appellate court's ruling. Indeed, the Supreme Court has ruled that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment." *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) (citing *Hurtado v. California*, 110 U.S. 516 (1884)). Hence, the state court decision is not "contrary to" or "unreasonable application" of the relevant precedents nor does it rest on an unreasonable factual determination. *See* 28 U.S.C. § § 2254(d). And, again, *Teague* precludes relief because the Supreme Court has held that *Ring* announced a new rule of procedure, but not a watershed rule of criminal procedure to be applied retroactively to cases on collateral review. *Schriro v. Summerlin*, 542 U.S. 348 (2004).

5. *Because the finding of both (i)(5) and (i)(7) aggravating circumstances constituted "double counting," the (i)(7) circumstance should not have been submitted to the jury and*

*the jury's consideration of both factors violated Hall's Eighth Amendments rights. (Pet., Ground VI).*

Petitioner contents that, under the circumstances of his case, it was improper to base a death sentence on the aggravating factor that the murder was committed while the defendant was engaged in committing arson and also on the factor that the murder was especially heinous, atrocious or cruel in that it involved torture or physical abuse beyond that necessary to produce death. Hall maintains that each of these aggravating circumstances is constructed on the same aspect of a defendant's behavior—that the victim was killed by fire. Hall also maintains that this amounts to "double counting" of the aggravators[12] and that the double counting of aggravating factors violates his right to due process of law and subjects him to cruel and unusual punishment in violation of the Eighth Amendment.

This issue was presented on direct appeal. The state court concluded that the findings that the murder was especially heinous, atrocious or cruel and that the murder was committed while defendant was committing arson were not based on the same evidence and did not amount to double counting of aggravating circumstances, despite the fact that the victim was set on fire inside her car. It further concluded that the conduct upon which the first aggravating circumstance was based was the torturous means selected to kill the victim and

---

[12] Double counting is defined as "the use of the same evidence to establish more than one aggravating circumstance." *State v. Hall*, 1996 WL 740822, at *20.

the suffering she endured in the hours prior to her death from the third-degree burns which covered over ninety-two percent of her body,[13] while the conduct underlying the second aggravator was Hall's commission of murder during the perpetration of a separate felony, the destruction of the automobile by arson. Reasoning that the (i)(7) felony-murder aggravating factor properly permits "the jury to consider the defendant's commission of a felony even though the felony, itself, was the means by which the victim's death was caused," the Court of Criminal Appeals found the application of both factors constitutional. *State v. Hall*, 1996 WL 740822, at *20.

Petitioner has not cited to a well established legal rule in Supreme Court cases to demonstrate that the state court unreasonably applied that rule to the facts of his case or that it reached a decision contrary to the Supreme Court precedent. Indeed, it would be difficult—if not impossible—to make that showing because the Supreme Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor [has it] passed on the "double counting" theory," *Jones*, 527 U.S. at 398, and because "it is not an unreasonable application of clearly established Federal law for a state

---

[13] The victim's treating physician testified at trial that Ms. Crozier sustained burns to over 96 to 97 percent of her body surface and that all but two to three percent of those burns were third-degree burns. Apparently, the state court's comment that she sustained third degree burns over 92 percent of her body was a calculation derived from the expert witness's testimony.

court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (citations and internal quotation marks omitted). Therefore, the state court's rejection of Hall's "duplicity" claim was not contrary to or an unreasonable application of well established Supreme Court precedent. No writ will issue with respect to this claim.

6. *In violation of the Sixth, Eighth, and Fourteenth Amendments, the proportionality review conducted by the Tennessee Supreme Court is fatally flawed. (Pet., Ground VIII).*

In this claim, petitioner asserts that, for several reasons, the proportionality review performed by the Tennessee Supreme Court in his case violated his constitutional rights. For example, though the statute required the reviewing court to identify similar cases and then compare the penalties imposed in those cases to the penalty in Hall's case, considering the nature of the crime and the individual defendant, the statute did not provide guidance for identifying similar cases, did not supply a standard or methodology for the comparison of cases, and did not apprise him as to the cases to be used in the review. This, he suggests, deprived him of due process, since he had inadequate notice and opportunity to be heard and to present evidence.

Hall raised the issue in both state appellate courts. The Tennessee Supreme Court rejected the claim, after noting that, in a previous opinion, it had provided a detailed analysis

of the precedent-seeking method it had employed over the last eighteen years in determining whether the death sentence imposed in a particular case is disproportionate to the sentence imposed in similar cases.  It then described that analysis and employed it in comparing Hall's death sentence with those in selected similar cases to find that his capital sentence was not disproportionate to the penalty imposed for similar crimes.

Respondent argues, sequentially, that Hall has failed to show that the disposition of the claim is unacceptable under § 2254(d), that comparative proportionality review is not constitutionally mandated, that a death sentence is presumed to be proportionate where the system provides constitutionally valid aggravating and mitigating factors sufficient to guide the sentencer, and that relief on this claim is *Teague*-barred.   Hall responds that his claim is not precluded by *Teague* since the due process right upon which he relies is "fair notice" and "an opportunity to be heard," as was established in *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (the opportunity to be heard is an essential component of due process) and in *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (a death sentence imposed in part on information that a defendant had no opportunity to explain or deny violates due process).   For that same reason, Hall suggests that the Court should disregard the State's argument that the decision of the state court is unassailable under § 2254(d) because no federal case has directly addressed this identical issue.

Once again, respondent offers more convincing arguments. Relief on this claim is *Teague*-barred. Petitioner points to no Supreme Court case, issued before his own case became final, which held that proportionality review on the part of a state court is constitutionally mandated. Certainly, the Court is unaware of any such a case. Therefore, applying the rule advocated by petitioner to his case would violate the retroactivity doctrine in *Teague*.

Alternatively, comparative proportionality review by state appeals courts is not dictated by the Constitution. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984). "[W]here statutory procedures adequately channel a sentencer's discretion [in imposing the death penalty], proportionality review [of a death sentence to sentences imposed in similar cases] is not constitutionally required." *McCleskey*, 481 U.S. at 306 (citing *Pulley*, 465 U.S. at 50-51); *see also Whitmore v. Arkansas*, 495 U.S. 149, 169-70 (1990) (Marshall, J., dissenting) ("Moreover, although the Court held that the Constitution does not require appellate courts to engage in proportionality review, it nevertheless acknowledged that [a prior case] suggested that some form of meaningful appellate review is required.") (citing *Pulley*, 465 U.S. at 45)); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976) ("Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard

of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.").

Given this line of authority, petitioner cannot show that the state court's disposition of his proportionality claim was contrary to or an unreasonable application of a governing legal rule in a Supreme Court precedent. *Mirzayance*, 129 S. Ct. at 1419 ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

7. *Trial and appellate counsel were ineffective for failing to argue that the execution of Lee Hall would violate international legal obligations binding on the United States, as well as the Eighth Amendment (Pet. Ground X).*

Petitioner faults counsel for failing to argue that his execution would violate his rights under international law and treaties ratified by the United States. Some of the rights guaranteed through international law which counsel allegedly failed to raise include: the right to life, the right to be free from discrimination on the basis of economic status, the right not to be executed for the crime because it was not sufficiently aggravated, the right not to be executed by lethal injection or electrocution because these punishments qualify as cruel, inhumane, and degrading punishment, the right to a fair and impartial trial, the right to detailed notice of the charges against him, the right to adequate time and resources in which

to prepare his defense, the right to examine witnesses against him, and the right to be free of coercion to confess guilt.

Hall raised the international law issue in the trial and appellate courts during his post-conviction proceedings. At the same time and in the same claim, Hall also argued that international standards concerning the death penalty are relevant to Hall's Eighth Amendment claim that the death penalty is cruel and unusual.

The Tennessee Court of Criminal Appeals declined to grant relief on the claims, citing, *inter alia*, to *State v. Odom*, 137 S.W.3d 572, 599 (Tenn. 2004), as a case in which the argument had been rejected. In *Odom*, the state appellate court had itself cited various cases, including *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001), where the Sixth Circuit rebuffed similar arguments with respect to the Ohio death penalty scheme. Noting that the authorities appear to be in agreement that no customary or international law or international treaty prohibits a state from imposing the death penalty as a punishment for certain crimes, the *Odom* court found the claim to be without merit. The state appellate court, likewise, dismissed Hall's Eighth Amendment claim that the death penalty is cruel and unusual, citing to the same authorities.[14]

---

[14] The cases cited by the state court do not address this exact claim—all involve a run-of-the-mill Eighth Amendment challenge to Tennessee's capital sentencing scheme and do not mention international law as it relates to Eighth Amendment jurisprudence.

Respondent argues that the adjudication of this claim by the state courts was not contrary to or an unreasonable application of federal law. Hall responds that the Supreme Court considers international law as part of its Eighth Amendment analysis. He cites various Supreme Court cases which show that this is so. Among them are *Roper v. Simmons*, 543 U.S. 551, 574-76 (2005); *Atkins v. Virginia*, 536 U.S. 304, 316 n.21 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 830-31 n.34 (1988); *Ford v. Wainwright*, 477 U.S. 399, 409 (1986); and *Coker v. Georgia*, 433 U.S. 584, 596 n.10 (1977).

In a case not cited by petitioner, the Supreme Court observed that "[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Medellín v. Texas*, 128 S. Ct. 1346, 1357 n.3 (2008) (quoting Restatement (Third) of Foreign Relations Law of the United States § 907, cmt. *a* (1986)); *accord*, *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001) ("As a general rule . . . international treaties do not create rights that are privately enforceable in the federal courts.").

---

At any rate, Hall does not counter the State's "deferential review" argument nor cite to the principle in a Supreme Court case which establishes the proposition he submits. Accordingly, because petitioner has not directed the Court's attention to a Supreme Court case which holds as governing law the rule he now proposes, he has failed to show that the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law. Moreover, Hall has not supported his habeas claim with facts establishing either a deficient performance on the part of counsel or prejudice stemming therefrom so as to show a *Strickland* violation. Thus, with respect to this claim, relief is not justified under the standards in § 2254(d).

C. Procedurally Defaulted Claims.

1. *Petitioner's attorneys were constitutionally ineffective during the penalty phase of his capital trial for failing to present available mitigation that petitioner did not form the required mens rea to be guilty of first degree premeditated murder and for failing to present background and psychological evidence about their client. [Pet., Ground II].*

   a. *Inability to Form Intent.*

Petitioner claims that the same mitigating evidence pertinent to the guilt phase (i.e., that Hall was incapable of forming the *mens rea* element necessary for a premeditated murder conviction) would have been relevant also as mitigating evidence at sentencing. According to petitioner, proof adduced during the post-conviction proceedings—of his tempestuous and

violent relationship with the victim, his family background of instability and mental illness, his long and significant history of substance abuse, his extreme emotional distress and significant impairment by drug and alcohol use at the time of the offense, and his actions on the evening of the crime—would have been critical proof that his intent was to burn Ms. Crozier's car and not to kill her in the process.

This evidence, Hall maintains, could have supported a finding of two statutory mitigators—that he was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct or conform it to the requirements of the law was substantially impaired by a mental disease or defect or intoxication, *see* Tenn. Code. Ann.§ § 39-12-204(j)(1) and (j)(8)—which, in turn, could have persuaded the jury to impose a sentence less than death. Respondent counters that Hall failed to offer the state courts a claim of ineffective assistance based on counsel's failure to offer *mens rea* proof at sentencing and, thereby, has committed a procedural default of his claim.

The record shows that Hall presented certain post-conviction claims of ineffective assistance at the penalty phase of trial, but that this particular claim was not in that grouping. State court review of the claim now is foreclosed by Tennessee's post-conviction one-year limitations statute and its "one petition" rule. *See* Tennessee Code Ann. § 40-30-102(a) and § 40-30-102(c). Thus, the claim is technically exhausted but deemed to be procedurally

defaulted. *Coleman*, 501 U.S. at 732. Federal review is barred unless Hall can show both cause and prejudice to excuse his default. Alternatively, a showing of actual innocence on Hall's part will secure federal review.

Hall has submitted nothing to show cause or prejudice for his procedural default, but merely insists that the state courts denied his claims of ineffective assistance in a decision that is contrary to or an unreasonable application of clearly established federal law or is based on an unreasonable factual determination. Petitioner's failure to offer his federal claim to state courts before raising it here amounts to an unexcused procedural default.

Even if there were no procedural default, the element of prejudice in the ineffective-assistance claim is lacking. Hall argues that his lawyers' failure to offer evidence that he was unable to form the requisite *mens rea* was prejudicial because the omitted evidence would have supported a finding of the two statutory mitigators in Tenn. Code. Ann. § 39-13-204(j)(1) and (j)(8).

The Sixth Circuit has held that no prejudice ensues where a petitioner's main argument is only "contentions that counsel failed to expand on or corroborate or fully develop the factors listed in" his psychologist's report that were testified to in front of the jury. *Hartman v. Bagley*, 492 F.3d 347, 361(6th Cir. 2007). Here, Hall's mental health expert testified at sentencing that his patient had post-traumatic stress disorder and borderline

personality disorder, was extremely upset over the victim's abortions, feared that she might be pregnant and, if so, that she was planning to have another abortion.  The jury heard evidence about Hall's past drug and alcohol abuse, his consumption of those substances during the three weeks preceding the murder, his alcohol intoxication on the night of the murder, the turmoil and verbal and physical abuse involved in his roller-coaster relationship with the victim, and the devastating emotional effect his break-up with the victim had had on him.  Indeed, his mother described him as a "basket case" who would "walk around and cry and drink and walk and talk and cry," but who would be "all smiles" when they would get together.  (Addendum 2, vol. 11, Sarah Griffin's Test. at 1479).

Also, the jury was instructed as to those respective mitigating factors (i.e., defendant was suffering from "extreme mental or emotional disturbance" and was substantially impaired as a result of a mental disease or intoxication) and, under state law, these instructions could not have been given unless the evidence presented at the sentencing hearing had fairly raised these issues.  *See* Tenn. Code Ann. § 39-13-204 (e)(1) ("After closing arguments in the sentencing hearing, . . . [t]he trial judge shall [] include instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j)") (emphasis added).

Thus, evidence was offered to support the existence of these two mitigators and petitioner has not established that the allegedly missing proof differed in a "substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). Thus, there is no prejudice from this alleged attorney error. *Id.*

   *b. Background and Psychological Evidence.*

According to Hall, there was proof of his background and mental make-up which counsel failed to find and to offer at sentencing. Hall maintains that this evidence would have humanized him, would have given the jury an explanation for the events of April 17, 1991, and would have carried significant weight in mitigation.

In his brief on his post-conviction appeal, Hall claimed that counsel was ineffective for failing to investigate his history, specifically sexual abuse allegations, and that "the lack of a coherent mitigation presentation also speaks to the lack of investigation and preparation." Mitigation, Hall argued, amounted to a hope that the jury would feel sympathy for him. Hall contended that counsel failed to present an affirmative case for life, but instead asserted that he was relying on jury nullification to save Hall from a death sentence. It was Hall's view that this line of defense was, in effect, a concession that the State would prove its case for death beyond a reasonable doubt.

The claim outlined above was litigated in the state post-conviction court and raised on appeal. The Tennessee Court of Criminal Appeals first found that the trial attorneys knew that Hall's mother suspected that he may have been abused, but that the accused's own denials of sexual abuse substantially supported the reasonableness of counsel's decision not to pursue this issue. The state appellate court further found that testimony given at the post-conviction hearing by witnesses who did not testify at trial would have been cumulative of other evidence offered at trial and that portions of the post-conviction proof would have been detrimental to the defense.

The Court of Criminal Appeals also pointed out that some witnesses indicated that they had conveyed certain facts to the defense at the time of trial, while others mentioned that they would have invoked the Fifth Amendment on drug usage testimony. Too, the intermediate state court considered Attorney Heck's testimony that he tried to limit unfavorable information, such as drug sales in which Hall purportedly had engaged, and to present favorable information. It ultimately ruled that Hall had failed to show any inadequacy in the investigation or any resulting prejudice from counsel's claimed shortcoming.

To the extent that Hall's habeas claim is the same as his post-conviction claim, the state court's decision is not contrary to or an unreasonable application of *Strickland*. Nor

is it based on unreasonable factual determinations.  An attorney's decision not to investigate and present evidence implying the sexual abuse of a defendant who steadfastly denies the abuse is not an objectively unreasonable decision.  Had counsel chosen to pursue this line of defense by presenting those witnesses, it is entirely possible, if not likely, that his client, in testifying against counsel's advice, would have insisted that he was not sexually abused, as he always has insisted.

As to Hall's background and history, counsel hired an investigator to explore those issues and a psychologist to perform a mental evaluation.  Counsel gave the psychologist a copy of the investigator's report and the psychologist testified about petitioner's psychological make-up as reflected in the mental examination.  Petitioner's mother also testified as to the family's peripatetic lifestyle and the numerous schools he had attended and his relatives and friends offered testimony concerning his abuse of drugs and alcohol.  There was also proof concerning Hall's  relationship with the victim.  "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." *Broom v. Mitchell,* 441 F.3d 392, 410 (6th Cir. 2006); *see also Hartman*, 492 F.3d at 361 ("As this court has previously stated, '[o]ur cases reject a requirement that any later-identified cumulative mitigating evidence must have been

introduced in order for counsel to be effective.'") (citing *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005)).

And, even if counsel's presentation of the mitigation defense was so lacking in this respect as to amount to a deficient performance, petitioner was not prejudiced. *See Hartman*, 492 F.3d at 361 (no prejudice where petitioner merely contends that his attorney did not expand on or fully develop factors in a psychologist's report which were testified to by lay witnesses in front of the jury). Again, the claimed missing evidence is not substantially different from that adduced at trial, though granted, it is more detailed and somewhat stronger, *see Hill*, 400 F.3d at 319, and would have provided the jury with a fuller understanding of the psychological testing results of the testing. Nonetheless, had all the proof urged by petitioner been included at his sentencing, it would not have offset evidence offered at the guilt phase concerning the nature of the killing, the expert's and eyewitnesses' descriptions of the victim's traumatic injuries, the photographs depicting those injuries and the burned vehicle, and Hall's testimony that he had seen the victim lying in the front seat before he threw the lighted jug of gasoline — all of this proof still fresh in the minds of the jurors—and would not "have influenced the jury's appraisal of [the] petitioner's moral culpability." *See Williams*, 529 U.S. at 396; *see also Grayson v. Thompson,* 257 F.3d 1194, 1228 (11th Cir. 2001) ("In light of the horrendous nature of this crime, we find no reasonable

probability that the sentence would have been different if the . . . jury had possessed detailed information regarding [petitioner's] history.").

2. *Lee Hall's due process right to a fair trial guaranteed by the Fourteenth Amendment to the U. S. Constitution was violated by the combined effect of two errors: the introduction of prior bad acts and the jury instructions on the element of premeditation (i.e., that premeditation can be achieved in an instant and that it is immaterial whether an accused may have been in a state of passion at the time of the killing).[15] [Pet., Ground III (part)].*

    a. *Combined Effect of the Two Errors.*

In state court, Hall asserted that the formed-in-an-instant jury instruction, when combined with the prosecutor's closing argument emphasizing the instantaneous aspect of the instruction could not have been harmless. However, the two claims presented in the habeas petition [jury instructions and the admission of bad-acts evidence] were raised in state court as separate and distinct grounds, and no argument was made that the combined effect of *these* errors denied Hall a fair trial. Having failed to raise the same combination-of-errors claim in state court, Hall has committed a procedural default of his habeas claim. Furthermore, even absent a procedural default, neither the bad-acts evidence nor the questioned jury instructions were found to be error, *see Hall,* 1996 WL 740822 at *10 -*13, *18 -*19, and "the accumulation of non-errors cannot collectively amount to a violation of

---

[15] As noted earlier, Hall also challenges the "heat of passion" instructions. *See* section B.3.d.

due process." *Campbell v. United States,* 364 F.3d 727, 736 (6th Cir. 2004) (internal quotation marks omitted); *see also Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) *(en banc)*.

     b.  *"Heat of Passion" Instructions.*

Hall challenges the portion of the charge that tells the jury that it is immaterial that the accused may have been in a state of passion or excitement at the time of the killing. Respondent, referring to Hall's direct appeal briefs, argues that this claim was not raised in the Court of Criminal Appeals and, thereby, was procedurally defaulted. Respondent also suggests that the default was not overcome when, afterwards, it was offered to the state supreme court which did not rule on it. Hall demurs, pointing out that the Tennessee Supreme Court did not enforce its waiver rule and that, under the *Maupin v. Smith* factors, there has been no procedural default.

 Hall is mistaken. While the Court recognizes that exhaustion does not depend upon whether a state appellate court has ignored in its opinion a federal constitutional claim squarely put before it, *Smith v. Digmon*, 434 U.S. 332, 333 (1978), it likewise knows that, as a precondition, the claim must be presented to the state appellate court in a procedurally appropriate manner, i.e., in accord with that State's procedural rules. *Castille v. Peoples*, 489 U.S. 346, 351 (1998) (holding that a claim is not fairly presented, if it is offered for the first

and only time in a procedural context in which its merits will not be considered absent "special and important reasons therefor"). This is what happened here. Petitioner's failure to raise this claim in the Court of Criminal Appeals was not procedurally cured by raising it thereafter in the state supreme court. *See O'Sullivan*, 526 U.S. at 845-47 (for purposes of exhaustion, a claim must be offered to each court in the established state appellate review process); *Castille*, 489 U.S. at 351 (presenting a claim for the first time to the state's highest court for discretionary review does not exhaust it); *cf. Adams v. Holland*, 330 F.3d 398, 403 (6th Cir. 2003) (finding that, under Tenn. S. Ct. Rule 39, raising a claim in the Tennessee Court of Criminal Appeals will suffice to exhaust it), *cert. den.*, 541 U.S. 956 (2004).

Thus, by failing to fairly present the State's lower appellate court with his federal claim and to anchor that claim to the same facts and law which support it in this habeas court, Hall has committed a procedural default. *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987). And by failing to allege or show cause and prejudice, he has forfeited federal review. *Engle v. Isaac,* 456 U.S. 107, 129 (1982) ("[A]ny prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

3. _Lee Hall's right not to be subjected to cruel and unusual punishment under the Eighth Amendment was violated by the jury instruction on the aggravating circumstance in Tenn. Code Ann. § 39-13-104(i)(5) because it failed to narrow the class of persons eligible for the death penalty.  [Pet., Ground V]._

Petitioner's jury was instructed that it could find him eligible for the death penalty if it found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved

torture or serious physical abuse beyond that necessary to produce death." *See* Tenn. Code Ann. § 39-13-104(i)(5). The jury further was told that "[t]orture means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." According to Hall, the instruction omits a requirement that the severe pain or serious physical abuse be "willfully" inflicted, given that the state supreme court has held that, to be guilty of torture, an accused must have willfully inflicted severe pain on the victim.[16] Petitioner concludes that the questioned instruction did not narrow the class of death-eligible defendants, as the Eighth Amendment commands.

Respondent argues that the claim was raised for the first time in the Tennessee Supreme Court on direct review and that the failure to raise it earlier in a motion for a new trial or in the Court of Criminal Appeals constitutes a procedural default. Hall replies that, though the claim was fairly presented, the state supreme court did not address it and did not apply the waiver rule to it. Respondent counters that the claim was treated as waived since it is well-settled law that issues raised for the first time on appeal are waived. Respondent further suggests that the claim was not properly before the state supreme court in the first place, having never been presented to the lower state courts. Hall's final argument is that, regardless of whether a claim has been previously raised, the state supreme court is required

---

[16] The Court's research does not support that a *mens rea* requirement is imposed on this aggravator. *See State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999) ("Circumstance (i)(5) does not require a *mens rea*. The aspect of torture focuses on the circumstances of the killing.")

by state law to review all capital cases to insure against arbitrary imposition of the death penalty; thus, the Tennessee Supreme Court implicitly reviewed the claim.

The Court has examined petitioner's state court filings. In his brief to the Court of Criminal Appeals, in Claim X.A.2, Hall alleged that the (i)(5) circumstance is vague and overbroad. In that section, Hall argued that one of the problems with the state supreme court's limiting construction of the HAC aggravator in *State v. Williams,* 690 S.W.2d 517 (Tenn. 1985), was that there had been no limiting definition for the physical abuse prong of (i)(5) and that it, therefore, remained vague. (Addendum 4, Doc. 1 at 118-119). When Hall carried the issue to the Tennessee Supreme Court, he claimed that, because there was no requirement that the serious physical abuse be "willfully" inflicted by a defendant, the instructions on the HAC aggravator did not narrow the class of death-eligible defendants. (Addendum 4, Doc. 6 at 118-119)

Though Tennessee has established a two-tier appellate review system for a death-sentenced inmate—a right of direct appeal to the Court of Criminal Appeals and an automatic review by the state supreme court, *see* Tenn. Code Ann.§ 39-13-206 (a)(1), petitioner did not present this particular challenge to the (i)(5) factor to the State's lower appellate court. As noted earlier, habeas relief cannot be granted unless a petitioner has given the state courts a full and fair opportunity to resolve his constitutional claims by invoking one full round of a state's established appellate review process. *See O'Sullivan*, 546 U.S. at 845; *see also Beach v. Moore*, 2009 WL 2487357, *3 (6th Cir. Aug. 17, 2009) ("In order to preserve his . . . claim, [petitioner] must have fairly presented it both to the

Supreme Court of Ohio and to the Court of Appeals of Ohio. Put differently, if [petitioner] failed to fairly present his claim to either state court, it is unexhausted.") (citing *Baldwin*, 541 U.S. at 19).

Hall's alternative argument is that the state supreme court implicitly reviewed the claim under its mandatory review requirement, despite the "waiver" rule, despite his failure to raise the claim in the appellate court, and despite the lack of any mention of the claim in the highest state court's opinion. That argument likewise is rejected. *See Bell v. Cone*, 543 U. S. at 451 n.3 (dicta) ("[A]s a general matter, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised."). Statutorilymandated independent review on direct appeal by a state appellate court for errors or defects is not sufficient to preserve a claim for federal habeas review where the petitioner failed to present the claim to the state appellate court. *See Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005); *Kornahrens v. Evatt*, 66 F.3d 1350, 1362 (4th Cir.1995); and *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir.1988); *see also Bronshtein v. Horn*, 404 F.3d 700, 726 (3d Cir. 2005) ("It seems fanciful to suggest that, in every capital appeal, the state supreme court actually considers and rejects a host of federal constitutional claims without receiving briefing or argument on those claims from counsel and without even mentioning in the opinion of the court that the claims were entertained.").

As indicated, Hall failed to offer each of Tennessee's appellate courts a full and fair opportunity to consider his claims. "[W]e ask not only whether a prisoner has exhausted his

state remedies, but also whether he has *properly* exhausted those remedies, *i.e.,* whether he has fairly presented his claims to the state courts." *O'Sullivan*, 526 U.S. at 848 (italics in original). At this point, there are no available state court remedies to redress the claim because all avenues of state court relief are time-barred or otherwise foreclosed. "[W]hen the prisoner fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas corpus review of those claims, absent a showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O'Sullivan*, 526 U.S. at 848; *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); and *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)). Hall has offered no cause or prejudice to overcome the procedural default and federal review is barred on this claim.

If, however, the claim was not procedurally defaulted, it would garner Hall no relief. First, to the extent that petitioner bases his claim on the state supreme court's holding that "torture" requires that serious physical injury be "willfully" inflicted, this is not a recognizable habeas corpus claim. Interpretation of state statutes is a matter for the state courts since those courts are the final arbiters of state law. *See Lewis v. Jeffers,* 497 U.S. 764, 780 (1990); *see also Estelle v. McGuire,* 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Even if this were not so, Tennessee jurisprudence contradicts Hall's claim that the HAC aggravating factor contains a *mens rea* requirement: "[I]ntent is irrelevant in the

(i)(5) aggravating circumstance because the focus remains on the circumstances of the killing." *Owens v. State*, 13 S.W.3d 742, 764 (Tenn. Crim. App.1999).

Secondly, to the extent that this claim was subsumed in Hall's other challenges to this aggravator—that the (i)(5) circumstance did not narrow the class of death eligible defendants because it, in combination with three other factors, encompassed the majority of the homicides—the state court found the issue lacking in merit because there was nothing in the record to support it.[17]  In rebuffing Hall's general claim that the state's death penalty statute "fails to narrow in a meaningful manner the class of death eligible defendants [and] that the death sentence in Tennessee is imposed arbitrarily and capriciously," the Court of Criminal Appeals necessarily rejected the proposition that the factor was unconstitutional.   In resolving Hall's claim that the (i)(5) factor was vague and overly broad, the state appellate court cited to *Owens*, where the Tennessee Supreme Court found this aggravating factor constitutional.  As the state supreme court later explained in *State v. Keen*, 31 S.W.3d 196 (Tenn. 2000): "The United States Supreme Court has never held that the 'especially heinous, atrocious, or cruel' circumstance is unconstitutional in the absence of any mental requirement, and we conclude that the absence of a mental state does not render this circumstance constitutionally infirm in this state." *Id.* at 211.

A petitioner will be entitled to habeas corpus relief if the state court's adjudication of a claim was contrary to or an unreasonable application of the relevant rule contained in a

---

[17]  As observed previously, the state supreme court attached the lower appellate court's opinion as an appendix to its own, thereby adopting the inferior state court's findings.

Supreme Court decision. As noted earlier in this opinion, the Supreme Court in *Cartwright* approved an HAC aggravating factor which was limited to killings in which the victim sustained "some kind of torture or serious physical abuse" before the murder. *Cartwright*, however, did not require that the murderer possess any state of mind whatsoever when he inflicted the torture or serious physical abuse on the victim. Hall has not pointed to a Supreme Court case holding what *Cartwright* did not hold—that an HAC aggravating factor is unconstitutional if it does not require that torture or the serious physical abuse be "willfully" inflicted. Accordingly, petitioner is not entitled to the writ.

4. *The reasonable doubt instructions in both phases of Lee Hall's capital trial were constitutionally deficient in violation of his rights to due process guaranteed by the Fourteenth Amendment to the U.S. Constitution. [Pet., Ground VII].*

Hall's jury was instructed that a finding of reasonable doubt referred to the required degree of proof as being to a "moral certainty" and excluded from the definition of reasonable doubt a "possible" doubt and a "doubt that may arise from possibility." Petitioner maintains that these instructions, given at trial and sentencing, violated his due process rights.

Respondent argues that the claim was raised for the first time in the Tennessee Supreme Court on direct review and that the failure to raise it initially in the Court of Criminal Appeals constitutes a procedural default by application of Tennessee's waiver rule. Hall replies that the state supreme court did not address the claim, though it was fairly presented, and did not actually enforce the waiver rule. Therefore, according to petitioner's lights, he did not commit a procedural default. Respondent counters that the claim was

treated as waived since it is well settled that issues raised for the first time on appeal are waived. Hall's second argument against procedural default is the "implicit review" argument he made in connection with the previous claim.

A review of the state court record shows that this claim was not presented in Hall's brief to the Court of Criminal Appeals, even though the claim was raised in the Tennessee Supreme Court. As in the prior claim, petitioner skipped a step in the appellate review process by failing to offer the claim to the Court of Criminal Appeals. *See Baldwin*, 541 U.S. at 29 ("To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in **each appropriate state court** . . . thereby alerting that court to the federal nature of the claim.") (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) and *O'Sullivan*, 546 U.S. at 845) (emphasis added)). As noted earlier, habeas relief cannot be granted unless petitioner has given the state courts a full and fair opportunity to resolve his constitutional claims by invoking one full round of Tennessee's established appellate review process. *O'Sullivan*, 546 U.S. at 845. Hall's failure to do so constitutes a procedural default. *See Zagorski v. Bell*, 326 Fed.Appx. 336, at *342, 2009 WL 996307, at *5 (6th Cir. Apr. 15, 2009) (rejecting the argument that the Tennessee Supreme Court reviewed the record for all possible claims, and finding that "it examined the record pertaining to the issues [petitioner] raised, but those claims he did not present remain defaulted") (citing *Baldwin*, 541 U.S. at 31).

If, however, the claim were not procedurally defaulted, petitioner is entitled to no relief. Earlier in this opinion, the Court evaluated Hall's claim that his counsel gave him

ineffective assistance for failing to object to these instructions, reviewed the Supreme Court jurisprudence involving reasonable doubt jury instructions, and found that, as applied to petitioner's case, there was no reasonable likelihood that the jury had used those instructions in a way that reduced the State's constitutional burden of proof. The same analysis is pertinent to this claim and petitioner is due no relief based on those instructions.

## V. **Certificate of Appealability**

The Court must now decide whether to issue a Certificate of Appealability (hereinafter COA) since a petitioner may not appeal from a final order in a § 2254 case unless a COA is issued. 28 U.S.C. § 2253(c)(1).[18] A COA will be granted where a court finds that a petitioner has made a "substantial showing" of the denial of a constitutional right. *Id.* at § 2253(c)(2). When a claim has been dismissed on the merits, a petitioner makes a substantial showing by demonstrating that jurists of reason would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). When a procedural bar serves as the basis for dismissal, without the merits of the underlying

---

[18] The statute provides, in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from-

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.

claim having been addressed, a petitioner makes a substantial showing by establishing that reasonable jurists would debate whether a valid claim has been stated <u>and</u> whether the court's procedural ruling is correct. *Id.* Since each prong of the § 2253 showing is necessary for issuance of a COA, a court may dispose of the application by resolving first the procedural issue "whose answer is more apparent from the record and arguments," without addressing the viability of the underlying claim. *Id.* at 485.

Other teachings guide the process. A petitioner need not show that he will prevail on the merits to be granted a COA. *Ibid.*; *Miller-El,* 537 U.S. at 336. Also, while "the nature of the penalty is a proper consideration . . . the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate." *Barefoot v. Estelle*, 463 U.S. 880, 893 (2000);[19] *accord, Miller-El*, 537 U.S. at 337 ("[I]ssuance of a COA must not be *pro forma* or a matter of course.") (italics in original). Finally, determining whether a COA should be granted does not require an in-depth examination of the facts and law undergirding the claim: only an overview of a claim's constitutional framework and its merits need be performed. *Id.* at 337. Each claim will be examined under this standard.

A. <u>Adjudicated Claims</u>

1. *<u>Ineffective Assistance [Guilt Phase] [Pet., Ground I]</u>*.

---

[19] The Supreme Court noted that § 2253 was a codification of its holding in *Barefoot v. Estelle*, 463 U.S. 880 (1983), which required a petitioner seeking a certificate of probable cause to make a substantial showing of the denial of a federal right, with the word "constitutional" in the statute replacing the word "federal" in *Barefoot*.

Overlying this genre of claims was the contradiction between the dates and times Attorney Heck's billing statements reflected that he had worked on Hall's defense (through contacts with his co-counsel, psychiatric expert, investigator, and actual or potential witnesses) and the dates and times of contacts to which those individuals testified. Indeed, Heck acknowledged that some of the dates contained in his bills might not correspond completely with the dates on which work was done, though he nonetheless insisted that his statement was accurate as to the work performed and the time claimed and, perhaps, was even lower than the 1,000 hours which he estimated he had actually spent on Hall's defense. The credibility issue was raised as a separate claim in the state appellate court during the post-conviction proceedings.

The Court of Criminal Appeals held:

Counsel's records were admittedly inaccurate as to the dates and times that he met with other people involved in this case. This, however, does not make his representation of the Petitioner ineffective. While we note that it is a better practice to be meticulous in keeping time records, the post-conviction court found that Counsel testified credibly as to the extensive job that he did for the Petitioner. In light of this finding, we conclude that Counsel's performance was deficient because of inaccurate time records. Further, we conclude that the Petitioner has not proven how any error in the time records has prejudiced him.

*Hall*, 2005 WL 2008176, at *35. In context with the entire paragraph, the only reading of the next to last sentence that makes sense is this: "In light of [the post-conviction court's credibility] finding, we conclude that Counsel's performance was *not* deficient because of inaccurate time records." If the state appellate court, in fact, deferred to the lower court's credibility finding that counsel had done extensive work on the defense, the only logical

conclusion that could possibly have been reached would have been that counsel's performance was *not* substandard.[20] But putting logic to the side, if the state appellate court truly found a deficient performance, it likewise found that no prejudice had been shown as a result of any inaccuracies in Attorney Heck's billing statement.

In reliance on AEDPA's standards of review, the Court declined to revisit the state court's credibility determinations. *Rice v. Collins*, 546 U.S. 333, 342 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). Instead, the Court evaluated each alleged instance of ineffectiveness asserted in Hall's § 2254 petition—credibility was not raised as a distinct claim—to determine whether, under the review standards in § § 2254(d) and (e)(1) and the test in *Strickland v. Washington*, 466 U.S. 668 (1984), petitioner was entitled to relief.[21] *See Owens v. Guida*, 549 F.3d 399, 407 (6th

_____

[20] The omission of "not" in such a context is not uncommon. Consider, for example, *McCray v. Warden, London Corr. Instit.*, No. 07-3983, slip op.(6th Cir. Feb. 16, 2010), which reads: "The state appellate court found that McCray's sufficiency-of-the-evidence claim was without merit, as reasonable minds could have reached different conclusions as to whether each element of the crimes had been proven beyond a reasonable doubt." *Id*. at *11. Clearly, the second clause is missing the word "not,"and the passage should read: "as reasonable minds could *not* have reached different conclusions as to whether each element of the crimes had been proven beyond a reasonable doubt."

[21] The Court recognizes that the Supreme Court has left open the question as to whether, under 28 U.S.C. § 2254(e)(1), a petitioner overcomes the presumption of correctness which attaches to state court factfindings by proving through clear and convincing evidence that a state court's finding of fact is inaccurate, or whether, as provided in § 2254(d)(1), his burden is lighter, meaning that he only need show that a state court unreasonably determined a fact in light of the evidence offered in the state court proceeding. *See Wood v. Allen*, 130 S. Ct. 831, 849 (2010).

Cir.2008) (noting that counsel's timesheets are not controlling and that counsel's alleged 2-hour investigation, in and of itself, does not entitle a petitioner to relief, absent allegations of specific attorney errors).

a. *The Mens Rea Issue*.

In this claim, Hall alleges that there was available evidence which would have shown that his mental condition and mental impairments rendered him incapable of forming the requisite *mens rea* but that, because counsel instructed the defense psychologist not to discuss with petitioner the circumstances of the fire, this evidence was not discovered or presented at trial. Also, according to Hall, trial counsel did not investigate his background, his family and social history, his turbulent and violent relationship with the victim, or his long history of substance abuse leading up to the fire, so as to determine what effect those factors had on his mental state at the time of the crime.

The Court noted that no prejudice had resulted since the jury heard evidence of Hall's intoxication but found it insufficient to negate intent and since his mental health experts acknowledged at his post-conviction hearing that he could have formed the necessary intent. Ultimately, the Court concluded that, absent a showing of prejudice, the state court did not unreasonably apply *Strickland* in rejecting petitioner's claim that his attorneys gave him ineffective assistance by failing to offer proof that he lacked the capacity to premeditate and deliberate the murder. Since the lack of prejudice is so clear, the conclusion as to this claim of ineffective assistance would not be debatable among jurists of reason. Therefore, a COA will not issue.

b. *The Fire Expert Claim.*

Petitioner asserts that his attorneys were constitutionally ineffective during the guilt phase of his capital trial for failing to obtain a fire origins expert to challenge the State's theory of the case. This claim involves the state court's determination that counsel's failure to obtain an expert to testify that the gas was thrown rather than poured on the victim did not fall below an objective standard of reasonableness because this was not an issue prior to trial and did not become an issue until Hall began changing his story during his trial. The state court also held that there was no resulting prejudice.

Because the state court's sole rationale for finding that counsel's representation in this instance was not objectively unreasonable rested upon a fact which was clearly and convincingly rebutted by the record, *see* § 2254(e)(1), that fact was not entitled to a presumption of correctness. Hall maintained, quite persuasively, that the origination of the fire was an important aspect of the state's theory of premeditation and that expert testimony supporting that the gas was thrown would have challenged the prosecution's expert who testified that it was poured on the victim and then ignited. Even so, being mindful of the Supreme Court's teaching that, if there is insufficient prejudice, a court need not determine whether counsel's performance was deficient, *see Strickland,* 466 U.S. at 697; *cf. Porter v. McCollum*, 130 S.Ct. 447, 453 (2009)("Because we find . . . counsel deficient, we must determine whether the [State] Supreme Court unreasonably applied *Strickland* in holding [petitioner] was not prejudiced by that deficiency."), this Court concluded that, regardless of any deficiency of performance, the state court's disposition of the ineffective assistance

claim on the basis of a lack of prejudice was not an unreasonable application of the Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

If reasonable jurists could debate this Court's resolution, under AEDPA, of Hall's constitutional claim or the adequacy of the claim "to deserve encouragement to proceed further," a COA must issue. *Miller-El,* 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot*, 463 U.S. at 893 n.4)). Issuance of a COA does not depend upon the certainty of ultimate relief nor whether jurists of reason would agree, after consideration of the claim on its merits, that petitioner cannot prevail. *Id.* at 337, 338.

The Court believes that the record fully supports that any failure on the part of counsel to secure an expert to testify that the fire originated with the ignition and tossing of a gas bomb, and not by pouring gasoline over a victim, did not result in prejudice. After all, Hall testified that the fire began in this way and, according to testimony offered at trial, the victim so stated. Moreover, as the state court explained, counsel's theory was that Hall did not possess the requisite mental state, not that the gas was thrown rather than poured.

However, jurists of reason might debate whether refuting the State's theory and bolstering Hall's testimony and the victim's statements about how the fire originated through the opinion of a fire origination expert, in view of evidence of Hall's emotional lability, intoxication, and drug abuse, would have persuaded at least one juror that it was plausible that the tossing of the gas bomb was an impulsive, alcohol fueled effort to burn the vehicle, and not a premeditated and deliberate act of murder. And, if so and even though this Court found it unnecessary to determine whether there was any deficiency of performance on the

part of Hall's attorneys, reasonable jurists might also question whether, in this case, counsel's informal discussion of the fire origin with an engineer he met at a party and, later, at a bar can be presumed to fall within the wide range of reasonable professional assistance required by the Constitution.[22]  A COA will issue on this claim.

    c. *The Medical Examiner Claim*.

The victim's treating physician testified at trial that the consistency of the burn on the victim's body was more in keeping with the gasoline having been doused than splattered on the victim—an opinion which Hall claims exceeded the scope of her expertise and which counsel should have objected to on the basis that she lacked the qualifications to render this opinion.  The Court found that because the state courts were not presented with the same claim raised in his habeas petition, the claim had been procedurally defaulted and, alternatively, that Hall had failed to show prejudice and to demonstrate that the state courts unreasonably applied *Strickland* in rejecting this particular ineffectiveness claim.  Regardless of whether this claim is viable, reasonable jurists would not debate the correctness of the above-described procedural ruling.  Accordingly, a COA will not issue on this claim.

---

[22]  The Supreme Court has granted a petition for certiorari review to decide a similar issue, i.e., whether a federal court fails to grant the deference mandated by § 2254(d) and "impermissibly enlarge[s] the Sixth Amendment right to effective counsel by elevating the value of expert-opinion testimony in a manner that would virtually always require defense counsel to produce such testimony rather than allowing him to rely instead on cross-examination or other methods designed to create reasonable doubt about the defendant's guilt."  *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009) (*en banc*), *cert. granted sub nom.*, *Harrington v. Richter*, 78 U.S.L.W. 3302 (U.S. Feb. 22, 2010) (NO. 09-587).

d. *The Guilty Plea Attempt*.

Hall claims that his attorneys gave him ineffective assistance by advising him to plead guilty to felony murder and aggravated arson in front of the jury, without first informing him of the consequences of the pleas. The pleas were rejected by the trial court after Hall expressed confusion during the plea colloquy.

The Court of Criminal Appeals agreed with the post-conviction court that there was no deficiency of performance in giving this advice; that, if there was, the inadequate performance did not prejudice the defense; and that, therefore, Hall's attorneys did not give him ineffective assistance by counseling him to enter those pleas. According to the state appellate court, the plea-entry strategy was potentially flawed, the record was unclear as to whether Hall's lawyers had explained the pleas to their client, and Hall's confusion was evinced on the record. Nevertheless, the state appellate court declined to second guess the challenged strategy and pointed out that the post-conviction court had accredited defense counsel's testimony that he had explained the plea to his client. There was no prejudice, according to the Court of Criminal Appeals, because Hall's theory of defense was that he did not premeditate the murder, not that he did not commit the murder during the perpetration of the aggravated arson, and because he testified to this effect.

This Court reluctantly concluded that the state court did not unreasonably apply *Strickland* in finding no deficient performance. Both attorneys testified at the post-conviction hearing as to the short time-frame in which the decision was made, the lack of

legal research preceding the decision, and the brevity of the discussion they engaged in with Hall about the pleas and the consequences before his attempt to enter them. And both attorneys knew of Hall's intellectual challenges, emotional instability, and unsound judgment. A strategic decision is one "borne of deliberation and not happenstance, inattention or neglect," *see Wood*, 130 S. Ct. at 853 (Stevens, J., dissenting) (citing Wiggins, 539 U.S. at 526), and jurists of reason might question whether counsels' last minute decision to have Hall plead guilty to felony murder and aggravated arson was based on reasonable professional judgment or, as petitioner argues, one which was ill conceived and which gave short shrift to his understanding of the consequences of the pleas.

Still, a COA depends upon an overview of a claim's constitutional framework and, with respect to a *Strickland* claim, a showing of "prejudice" is a necessary component of that structure. The effect on the jury of the abortive guilty pleas is difficult to assess but, certainly, it could not have been positive and must have been as confusing to jurors as it appeared to be to Hall himself. Nevertheless, "[i]t is not enough for this court to speculate that the jury would have chosen [a different] path. There must be 'a reasonable probability' that the proceeding would have been different." *West v. Bell,* 550 F.3d 542, 556 (6th Cir. 2008).

Given that the record is lacking any evidence of prejudice, but is replete with evidence of guilt, reasonable jurists would not find debatable or wrong this Court's conclusion that the state court did not apply *Strickland* unreasonably in rejecting this claim of ineffective assistance of counsel based on its finding that there is no reasonable probability that, absent

the plea attempt, the jury's decision would have been different.  No COA is warranted on this claim.

e. *Selection of a Jury*.

In this claim, Hall maintains that his attorneys gave him ineffective assistance in three instances while choosing a jury.  This Court found that the claim was not procedurally defaulted and, after an independent review of the record and the relevant principles in Supreme Court cases, that the state court's disposition of the claim was not contrary to or an unreasonable application of the controlling legal rules and did not result from an unreasonable factual determination in light of the evidence offered to the state court.  No COA will issue in this instance because jurists of reason would not find the Court's conclusion debatable or wrong.

2. *Ineffective Assistance [Guilt and Penalty Phases]*.

Hall maintains, in this claim, that counsel failed to object to impermissible jury instructions regarding the "heinous, atrocious and cruel" aggravating circumstance at the penalty stage,  reasonable doubt at both phases of the trial, and the mandatory death penalty at sentencing.  These attorney failings, he submits, amount to ineffective assistance.  Because the challenged instructions were not constitutionally impermissible and because Hall did not cite to a Supreme Court case holding that they were, this Court determined that the state court did not unreasonably apply the relevant rules in Supreme Court precedent, including

*Strickland*, in rejecting the claim.  Reasonable jurists would not debate the Court's disposition of the claim and, accordingly, a COA is unwarranted.

3.  <u>*Prior Bad Acts/ Jury Instructions on Premeditation and Deliberation [Pet., Ground III (part)]*.</u>[23]

Hall alleges that evidence that the victim's vehicle had been set afire twice before was admitted at trial in violation of his due process rights.  He further alleges that the jury instruction that "premeditation can be formed in an instant" likewise violates his right to due process.  The Court found that Hall's challenge to the admission of the bad-acts evidence was not a cognizable habeas claim and, alternatively, that he had failed to show that the state court's resolution of the claim was contrary to or an unreasonable application of the governing legal rule.  The jury instructions claim was found, sequentially, to be procedurally defaulted, precluded by the retroactivity rule in *Teague*, and conclusory.  Finally and alternatively, the Court found the claim to be doomed due to Hall's failure to demonstrate that the state court's rejection of the claim was contrary to or an unreasonable application of relevant Supreme Court precedent.  No COA will issue because reasonable jurists would not debate the correctness of the procedural bars.  But if a debate would ensue about the procedural holdings, those jurists would not find the Court's assessment of the claim debatable or wrong.

4.  <u>*Unconstitutional State Death Penalty System (Pet., Ground IX)*.</u>

---

[23] The last part of Ground III—"heat of passion" instructions and the combined effect of the errors—is addressed under the Procedurally Defaulted Claims category.

Hall asserts, in this claim, that the Tennessee death penalty scheme and its application violates the United States Constitution because its aggravating factors do not narrow the class of death-eligible murderers and because the death penalty is imposed capriciously and arbitrarily. This Court found that many of the subclaims had been procedurally defaulted or, in the alternative, that they had no merit or, if decided by the state courts, that the state court's disposition of the claims had not been shown to be contrary to or an unreasonable application of the relevant rule in a Supreme Court case. With respect to the subclaims dismissed as procedurally defaulted, reasonable jurists would not debate that the procedural bars were appropriately found. With regard to subclaims adjudicated on the merits, jurists of reason would not find debatable the Court's determination that petitioner did not demonstrate that the state court decision was contrary to or an unreasonable application of the governing legal rule in Supreme Court cases. Because reasonable jurists would not dispute the procedural ruling, a COA will not be granted.

5. *Due Process/Apprendi Claims [Pet., Ground IV]*.

Relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Hall maintains that, by failing to allege in the indictment the two aggravating circumstances found by the jury, the State violated his right to a jury determination of facts which increased his sentence from life imprisonment to death. The Court held that the claim was barred by the retroactivity rule in *Teague*, and that, in any event, the state court's disposition of the claim was not contrary to or an unreasonable application of the governing precedent and did not rest on an unreasonable factual

determination.  *See* 28 U.S.C. § § 2254(d) (1) and (d)(2).  No COA will issue with respect to this claim because reasonable jurists would not disagree that this claim is procedurally foreclosed by *Schriro v. Summerlin*, 542 U.S. 348 (2004).

6. *The "Double Counting" Claim (Pet., Ground VI).*

Petitioner argues that the aggravating factors in his case (the felony-murder and the heinous, atrocious and cruel aggravating circumstances) were established by the same conduct—that the victim was killed by fire, that this amounts to "double counting," and that it violates the Cruel and Unusual Punishments and the Due Process Clauses of the Eighth and Fourteenth Amendment, respectively.  This Court denied relief, holding that the state court's rejection of Hall's double counting claim was not contrary to or an unreasonable application of well established Supreme Court precedent.  No COA will issue with respect to this claim because reasonable jurists would not find the Court's assessment of the claim debatable or wrong given the Supreme Court's statement in *Jones v. United States*, 527 U.S. 373 (1999): "We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory."  *Id.* at 378

7. *Proportionality Review (Pet., Ground VIII).*

Hall asserts that the proportionality review performed by the state supreme court violated his constitutional right to due process.  The Court held that it was barred by the *Teague* rule and, alternatively, that the state court's adjudication of the claim had not been shown to be contrary to or an unreasonable application of a governing legal rule in a Supreme

Court precedent. Reasonable jurists would not question the *Teague* bar ruling and, therefore, a COA is not warranted here.

8. *International Law Claim (Pet. Ground X).*

Petitioner faults both trial and appellate counsel for failing to argue that his execution would violate his rights under international law and treaties ratified by the United States. Because petitioner failed to offer facts to support either a deficient performance or prejudice on the part of his attorneys or to demonstrate that the state court's adjudication of his international law claim is contrary to or an unreasonable application of clearly established federal law, this Court denied relief. No COA is justified since reasonable jurists would not debate the Court's assessment of the underlying claim or the *Strickland* claim itself.

B. Procedurally Defaulted Claims

1. *Ineffective Assistance at the Penalty Phase [Pet., Ground II].*

Petitioner maintains that the same mitigating evidence pertinent to the guilt phase (i.e., that he was incapable of forming the *mens rea* element necessary for a premeditated murder conviction) would have been relevant at sentencing to show that his true intent was to burn the vehicle and not the victim, but that his attorneys failed to present it. This evidence, he contends, could have supported a finding of two statutory mitigators—extreme emotional disturbance and substantial impairment due to a mental disease or defect or intoxication–and, in turn, could have persuaded the jury to impose a lesser sentence than death. Hall further

contends that counsel, likewise, failed to offer available background and psychological evidence to humanize him and mitigate the death penalty.

The Court found a procedural default with respect to the *mens rea* claim and, alternatively, that relief was unavailable due to Hall's failure to establish the element of prejudice to support his claim of ineffective assistance. Since petitioner did not include this claim among the ineffective assistance claims raised before the state courts, reasonable jurists would not debate the Court's procedural ruling. However, if they would engage in such a debate, they would not dispute the Court's assessment of the *Strickland* claim. There was testimony to support the existence of these two mitigators and the purportedly omitted proof was not substantially different in subject matter or strength from that adduced in the sentencing hearing. Moreover, the omitted evidence that Hall did not commit the murder with premeditation and deliberation would have been offered to the same jury who had just heard, essentially, the same proof and who had rejected that same theory. Because there is no reasonable probability that, absent the alleged attorney errors, the jury would have determined that the balance of aggravating and mitigating factors did not justify a death sentence, *Strickland*, 466 U.S. at 695, jurists of reason would not dispute the Court's resolution of the claim on the basis of a lack of a showing of prejudice.

As to counsels' asserted failure to present evidence related to Hall's background or mental make-up, the Court determined that, to the extent the habeas claim was the same one offered to the state court, the state court's rejection of the claim was not contrary to or an unreasonable application of *Strickland* and was not premised on unreasonable factual

determinations. Hall's background, though far from idyllic, does not approach the magnitude of deprivation suffered by other capital petitioners who were found to have been prejudiced by their attorneys' failure to offer it as a mitigating factor. *See Hill v. Mitchell*, 400 F.3d 308, 318-19 (6th Cir. 2005) (listing cases). The Court concluded that there was no reasonable probability that presenting the additional evidence of Hall's mental make-up would have led the jury to determine that the balance between the aggravators and the mitigators did not justify death. *Strickland*, 466 U.S. at 695.

The mental health expert who testified at Hall's sentencing gave a lengthy and detailed accounting of the results of the various psychological tests administered to petitioner and the expert further testified that, during the time of the murder, petitioner was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct or to conform it to the requirements of the law was substantially impaired due to a mental disease or defect or intoxication. But the expert's opinion as to Hall's psychological state during the crime was undermined by the expert's acknowledgment that none of his inquiries to Hall during the mental health evaluation concerned the actual events of the murder.

While the Court remains convinced that, but for the omitted "background" evidence, there is a no reasonable probability that, in the eyes of the jury, the scales of mitigating and aggravating circumstances would have tipped to a sentence of less than death, it is possible that jurists of reason would dispute the Court's assessment of *Strickland's* prejudice component. Therefore, a COA is warranted with respect to this claim.

2.  *Combination of Bad-Acts Evidence and Jury Instructions Denied Due Process [Pet., Ground III  [Pet., Ground III (part)].*

Hall claims that the combined effect of proof of his prior bad acts and the "premeditation can be formed in an instant" jury instruction could not have been harmless. The Court found that, by failing to raise the claim on the same legal and factual premises in state court before raising it as a federal violation, Hall had committed a procedural default.[24]  The Court ruled, in the alternative, that neither the admission of the evidence nor the jury instructions were found to be errors and that the combination of non-errors is not violative of due process.  No COA will issue because reasonable jurists would not debate the correctness of the Court's application of the procedural bar.  But if a debate would ensue among reasonable jurists about the soundness of the procedural holding, those jurists would not find the Court's assessment of the claim doubtful or wrong.

3.  *Narrowing Claim  [Pet., Ground V].*

Hall's jury was instructed that he would be death-eligible if it found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death" and that "[t]orture means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." According to Hall, by omitting the requirement that the severe pain must have been willfully inflicted, this instruction violated the Eighth Amendment because it did not narrow the class

---

[24] In state court, he maintained that the "premeditation can be formed in an instant" jury instruction, when combined with the prosecutor's closing argument, which underscored the instantaneous aspect of the instruction, could not have been harmless.

of defendants eligible for the death penalty. The Court found that the claim had been procedurally defaulted and, alternatively, that it was not cognizable in habeas corpus proceedings and that the state court's adjudication of the claim was not contrary to or an unreasonable application of the relevant Supreme Court precedent. A COA will not be granted because jurists of reason would not dispute the correctness of the procedural rulings.

4. *Reasonable Doubt Instructions [Pet., Ground VII].*

Hall maintains that instructions at his trial and sentencing violates his due process rights because they defined reasonable doubt as proof to a "moral certainty"—not to an "evidentiary certainty"—and did not include in the definition a "possible" doubt and a "doubt that may arise from possibility." The Court held that the claim had been procedurally defaulted, and alternatively, that it had no merit. Reasonable jurists would not quarrel about whether the procedural bar was correctly found. No COA will issue.

## VI. **Pending Motions**

Finally, Hall has filed *pro se* motions to voluntarily dismiss his petition, for a hearing, and to ascertain the status of his case. Hall's motion to voluntarily dismiss his petition was combined with his motion for a hearing (Doc. 83)and followed by his motion to ascertain the status of his case. (Doc. 84). First of all, the order of these filings indicates to the Court that Hall did not truly wish to have his petition dismissed, but instead wanted an opportunity to express his desire to have his petition resolved. Indeed, in the motion for a hearing, petitioner insists that he "would like to be heard in open court to tell the problems [he has] with all involved." (Doc. 83). It makes no sense to seek a voluntary dismissal of a case and then to ask

the Court for a hearing to complain about the case. Secondly, under the Local Rules, after counsel has appeared on behalf of a party, that party may not make *pro se* filings. *See* LR83.4(c). At any rate, Hall's petition will be denied, thus rendering these motions moot.

## VII. <u>**Conclusion**</u>

In keeping with the above discussion, respondent's motion for summary judgment, (Doc. 40), will be **GRANTED**, and this petition (Doc. 12) will be **DISMISSED**. A COA is warranted and **SHALL ISSUE** on petitioner's claims that he had ineffective assistance when his attorney failed to obtain an arson expert to investigate and present evidence that the gasoline was thrown, not poured, on the victim and when he failed to offer available background and psychological evidence to humanize him and mitigate the death penalty. Finally, all other pending motions will be **DENIED** as **MOOT**.

An appropriate order will enter.

**ENTER**:


<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE