UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

| | |
|---|---|
| LEE HALL, ) | |
|     formerly known as Leroy Hall, Jr., ) | |
| ) | |
|         Petitioner, ) | |
| ) | |
| v. ) | NO. 2:06-CV-56 |
| ) | |
| RICKY BELL, Warden, ) | |
| ) | |
|         Respondent. ) | |

### **MEMORANDUM and ORDER**

Petitioner Lee Hall ("Hall" or "petitioner"), a state prisoner, filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his Hamilton County, Tennessee, convictions for first degree premeditated murder and aggravated arson and his resulting sentence of death and a consecutive 25-year prison term. This case comes before the Court for a determination of petitioner's competency to dismiss his application and forego his appeal.

### **I. Background**

In March of 2010, the Court denied Hall's petition ("application" and "petition" refer to the same pleading), dismissed his case, and granted him a certificate of appealability for some of his claims, [Docs. 85, 86]. Following that dismissal, petitioner filed a series of *pro se* letters and motions, indicating that he would like to dismiss his attorney, voluntarily dismiss his petition, be heard on his complaints about his case, forego any appeals, and proceed with his execution, [Docs. 83-84, 87, 89, 93 and 96]. The motions are now ripe for disposition, as is the Rule 59 Motion to

Alter or Amend the Judgment, filed by Hall's attorney, in order to protect his client's right to appeal, should he ultimately so choose, [Doc. 91].

On March 24, 2010, thirteen days after Hall's petition was dismissed, he submitted a letter and an unsigned "Motion To The Court," seeking a "voluntary dismissal" of the § 2254 petition and indicating that he was dissatisfied with his attorney ("I want him off my case and I want you to set me a execution date . . ."). Six days later, the Court issued an order directing the Clerk to file the motion, but to return to Hall the original, and advising him that, unless within ten (10) days, he returned a signed motion, the Court would strike it from the record, [Doc. 88]. Thereafter, Hall returned the motion with his signature affixed, [Doc. 93].

On March 31, 2010, Hall submitted what he entitled "Motion To Not Appeal From A Judgement [sic]," in which he gave notice that he is proceeding *pro se*, did not wish to seek any rehearing or proceed further with the case, related that he had been diagnosed with severe glaucoma and, according to a doctor, was going blind, and asked that his case be dismissed, [Doc. 89]. Hall's next communique consisted of a letter to the Court and a copy of a letter to his attorney, [Doc. 126, Attachment Nos. 1, 2]. In the first letter, Hall requested "any and all copies of anything that is filed by anyone" in his case and remarked that he "look(ed) forward to hearing from [the Court] on the recent motions [he had] filed." In the second letter, petitioner reiterated his dissatisfaction with counsel and the length of time this case has been pending in the courts and repeated that he desired "to have the sentence carried out."

On April 2, 2010, Hall submitted another letter, indicating that he wished to file an accompanying "To Whom It May Concern" letter as an exhibit to support the part of his "Motion to Not Appeal" in which he disclosed his glaucoma diagnosis, [Doc. 90, Attachment No. 1]. The

2

letter exhibit appears to have been prepared by Chasidy Singleton, M.D., and in it she discusses petitioner's diagnosis of very advanced "chronic angle-closure glaucoma of both eyes" and his unfavorable medical prognosis. Dr. Singleton stated, in the letter, that she had determined that Hall was not a good surgical candidate, due to the possibility that surgery "could likely cause the very small island of 20/20 vision" which he presently enjoys "to disappear."

### III. Competency Inquiry

Given Hall's prior history of mental evaluations, as disclosed in the record, the statements contained in his *pro se* filings, and the governing law, the Court held a preliminary inquiry on June 4, 2010, into his competency to withdraw his petition and abandon further litigation. At the hearing, petitioner, his attorney, and respondent's attorney stated their respective positions. Petitioner confirmed what he had said in his letters—that he wished to dismiss his attorney and give up his right to appeal. The Court engaged petitioner in the following extended discussion as to his reasons for surrendering himself to be executed:

> THE COURT: Mr. Hall, as I just indicated, this Court entered an order in March denying your petition for writ of habeas corpus. . . . You have now filed several pro se pleadings with this court indicating that you wish to dismiss your attorney, that you wish to take no appeal from the Court's order and that you wish to have your case dismissed. Is that still your desire?
> MR. HALL: Yes, sir.
> THE COURT: Tell me why you want to do that.

3

MR. HALL: Why? I Told you in that first letter, the one you give (sic) me ten days to sign and send back, I wrote down all the reasons why.

THE COURT: You realize what the effect of that would be?

MR. HALL: What now?

THE COURT: Do you understand what the effect or the result of that would be?

MR. HALL: I'd be giving up my last appeal.

THE COURT: Well, more bluntly, it would mean that the State could set an execution date and you would be executed. Is that what you want?

MR. HALL: Yes.

THE COURT: Why is that your desire?

MR. HALL: It's been going on too long, your Honor.

THE COURT: Have you attempted to discuss this matter with Mr. Ferrell?

MR. HALL: Yes, numerous times he told me to wait until you made a ruling on my case.

THE COURT: What is your complaint about the way Mr. Ferrell has been representing you?

MR. HALL: Just never could figure out why he wouldn't go before you now. I asked him why he wouldn't do it, he said I had to write you myself.

THE COURT: Well, Mr. Hall, to the extent you're blaming your attorney for the delay in deciding this case, that is misplaced blame. It's–there's no blame for that except with the Court. I know it took us a long time to rule on your petition; but Mr. Ferrell filed a very thorough application for a writ of habeas corpus, raised a lot of

4

issues, and some of them were difficult issues, and it took a fair amount of time for us to deal with those; so any delay that was occasioned is the Court's fault, not Mr. Ferrell's fault. Why would you want to dismiss your petition for writ of habeas corpus and have the State execute you? That's hard for me to understand.

MR. HALL: I ain't (sic) never got no (sic) help.

THE COURT: What do you mean by that?

MR. HALL: The state judge has denied me already.

THE COURT: Well, you have the right for it to go up to the Sixth Circuit and have three more reviews.

MR. HALL: I don't want to go blind in prison.

THE COURT: Don't what?

MR. HALL: Don't want to go blind in prison.

THE COURT: Don't want to go blind in prison?

MR. HALL: My eyes aren't getting no (sic) better.

[Doc. 103, Tr. of the Competency Inquiry, pp. 3-5].

The Court also heard from Stephen Ferrell, Assistant Federal Public Defender and petitioner's appointed counsel, who detailed the events which he believed had led to his client's request to discharge him as his attorney and to waive his appeal. Mr. Ferrell explained that petitioner had pressed him for information concerning the progress of the § 2254 petition and that, to mollify his client, he made predictions about the Court 's rulings. Counsel's predictions were proven wrong; petitioner was denied a writ. As counsel anticipated, his client reacted very

5

emotionally to the news—the denial had scudded Hall's optimistic expectations and replaced them with despair for his future, in counsel's opinion.

Mr. Ferrell then spoke about other troubling factors of petitioner's decision. Petitioner had twice attempted to dismiss collateral review proceedings in state courts. Once he changed his mind about withdrawing his petition. The second effort failed when the state trial court declined to dismiss the petition. Other problems, from Mr. Ferrell's viewpoint, were Hall's confinement conditions, his diagnosis of severe glaucoma, and Dr. Singleton's dismal prognosis for his sight. Hall had become preoccupied with his eyes to the point that the glaucoma diagnosis has made him incompetent to make the decision to dismiss his case and be executed, counsel believed. Too, Mr. Ferrell pointed to the inconsistency of Hall's singular focus on his medical prognosis, which looks to the future, and his decision to be executed, which ends life. Counsel's additional concerns were that, according to experts' findings, Hall suffered from depression and, possibly, brain damage and mental illness—all of which could overcome his client's rational ability to select execution rather than pursue an appeal. Mr. Ferrell had concluded that petitioner should undergo a mental examination.

Next to speak was respondent's counsel, Tennessee Assistant Attorney General Jennifer Smith, who expressed her belief that Hall understood the outcome of his proposed waivers of counsel and appeal and dismissal of his petition and that he had no diagnosed mental disease which would undercut his decision-making capacity. But, pointing out that petitioner had agreed to a competency exam, [Doc. 89, Letter from Petitioner], she concurred that a psychological assessment was in order to determine his competency.

6

Case 2:06-cv-00056   Document 127   Filed 09/22/11   Page 6 of 12   PageID #: 972

### IV.  Competency Assessment

Based on all these circumstances, including petitioner's responses to the Court's questioning at the hearing, the Court ordered a competency evaluation, and petitioner was transferred to U.S. Medical Center for Federal Prisoners at Springfield, Missouri, for that purpose.  Petitioner's stay at the federal facility was just shy of three months (August 4 - October 28, 2010), during which time he was observed and was mentally evaluated by a staff psychologist with the Bureau of Prisons (hereinafter "BOP").  The examining psychologist, Lea Ann Preston Baecht, Ph. D., has submitted a forensic report, which the Court *sua sponte* ordered sealed to protect petitioner's privacy and which contains: 1) the various sources from which information was obtained;[1] 2) Hall's background and history; 3) the evaluation process; 3) his present mental status; 4) a list of psychological tests administered and the results; 5) clinical formulation; 6) diagnoses, and 7) Dr. Baecht's opinion and prognosis. [Doc. 105, Forensic Report by Lea Ann Preston Baecht, Ph. D.] [Sealed Report].

According to Dr. Baecht, Hall did not evidence or endorse symptoms of a major mental illness, hallucination, delusions, clinical depression, a depressive disorder, anxiety disorder, or a significant character pathology which his prior evaluators had found (e.g., Borderline Personality Disorder, Personality Disorder with Marked Dependent, Avoidant, Obsessional and Borderline Traits), though she conceded that the record appeared to support the former diagnosis at one time.  However, nothing suggested to her that the symptoms of a Borderline Personality which Hall had

---

[1] Sources used were observations of and clinical interviews with petitioner, Hall's medical and personal history, his letters, Mr. Ferrell's letter to Dr. Baecht, affidavits of Hall's mother and aunt, four of petitioner's psychological reports, the post-conviction testimony of two of his mental experts, transcript from the June, 2010 competency inquiry, the order which thereafter followed requesting the mental evaluation, and the psychological tests administered to Hall.

7

displayed to the prior experts (i.e., engaging in frantic efforts to avoid abandonment, a pattern of unstable and intense interpersonal relationships, identity disturbance, impulsivity, and inappropriate, intense anger) had persisted during his incarceration. Indeed, she noted that persons with the former character disorder show significant conduct problems while imprisoned but that Hall's records reflected no such problems. The lack of symptoms, she surmised, could be attributed to his maturation while in prison or to his pre-incarceration significant substance dependence which had caused those symptoms. Dr. Baecht's mental health diagnoses were polysubstance dependence, in a controlled environment (Axis I), and adult antisocial behavior (Axis II). Of course, she also noted petitioner's diagnosis of Glaucoma and Gastroesophageal Reflux Disease (Axis III).

In Dr. Baecht's opinion, Hall does not suffer from a major mental illness, but, if he does have mild depression, his reasons for wishing to waive his appeals (i.e., does not believe his appeal will succeed; is "tired of waiting" and has been on death row for twenty years, and does not wish to go blind in prison waiting for the results of any appeal) are not illogical or irrational and, more important, not influenced by a major mental disease or defect. Petitioner asserted to Dr. Baecht that he did not wish to die, but preferred facing his death sentence over living in prison while blind. Hall's concerns about his vision, as Dr. Bacht viewed them, related to his quality of life—an important issue to most persons regardless of how long a life one expects to live.

Dr. Baecht concludes, in light of all this information, that petitioner is competent to proceed since he has the capacity to appreciate the nature and consequences of his decision to dismiss his habeas corpus proceedings and make a rational choice with respect to continuing or abandoning further litigation and that he has no major mental disease or defect which would hinder him from making such decisions.

8

Petitioner's counsel, with his client's permission, obtained Hall's medical records from the BOP and submitted those records and the Forensic Report to his own psychological expert, Dr. Faye Sultan, for review and, if deemed necessary, her own opinion as to competency. Following that expert's review, petitioner responded that he had no objections to the methodology used in the evaluation or to Dr. Baecht's conclusion as to competency, [Doc. 119]. Respondent, likewise, has no objections, [Doc. 121].

### V. Petitioner's Affidavit

Upon petitioner's request, [*Id.*], and due to the critical role Hall's medical diagnosis appears to have played in this matter, along with the possibility that his looming appointment with an eye specialist might cause him to change his mind, the Court entered an order deferring a ruling on Hall's pending motions until he had seen the specialist, [Doc. 122]. After that order was filed, the Court received an affidavit from petitioner [Doc. 124, Affidavit of Lee Hall], in which he explained that Mr. Ferrell had read to him the request to defer a ruling, prior to filing it, but that he [Hall] guessed he had not heard the part about the eye appointment having any impact on his decision. Petitioner disclaimed, in the affidavit, any desire to have the Court delay its decision because of his eye appointment, stating that he had all the information about his eyes he needed "from when I last saw the outside eye doctor on February 15th, 2011." Petitioner averred that he wished to dismiss his appeal and "get this over with," that his decision had not changed, that his mind was made up months before he had any inkling that he had Glaucoma, that he would really appreciate it if what he said in open court in June, 2010 would be accepted as his final decision, and that he would like

9

to "let this be the last time [he] had to worry with this," [*Id.*]. The Court has heard nothing further from Hall since he filed this affidavit.

## VI. Law & Analysis

A defendant facing execution may waive challenges to that execution, but only if he is competent to do so. *See Rees v. Peyton*, 384 U.S. 312, 313-14, 86 S.Ct. 1505, 16 L.Ed. 2d 583 (1966). In *Rees*, the Supreme Court held that "the Federal District Court in which this proceeding [*i.e.* the habeas corpus petition] commenced should upon due notice to the State and all other interested parties make a judicial determination as to [petitioner's] mental competence. *Id.* at 313.

*Rees* requires courts to determine "whether [petitioner] has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.* at 314; *Rumbaugh v. McCotter*, 473 U.S. 919, 919 (1985) (Marshall, J., dissenting) ("*Rees* specified the findings necessary to a determination that one who seeks to waive further review of a criminal conviction is competent to make such a grave choice."); *Awkal v. Mitchell*, 174 Fed. Appx. 248 (6th Cir. 2006) (acknowledging the *Rees* standard and remanding a case for a determination as to whether a capital petitioner who desires to drop his appeal and withdraw his § 2254 petition has the capacity to "appreciate his position and make a rational choice"); and *Brewer v. Lewis*, 989 F.2d 1021, 1026 n.4 (9th Cir. 1993) ( *Rees* "state[s] the test for determining whether a habeas petitioner is competent to waive his right to federal review of his conviction and sentence.").

10

The Court recognizes that Hall's desire to be executed is tied inextricably to the quality of life which he expects to have as a sightless inmate. *Lenhard v. Wolff*, 443 U.S. 1306, 1307, 100 S.Ct. 3, 4, 61 L.Ed.2d 885 (1979) (Rehnquist, Circuit Justice) (the "greatest philosophers and theologians" do not agree that to preserve one's life at whatever cost is the highest good). Still, this decision is one of the most difficult ones the Court has been required to make and one with which it has grappled. Other courts have faced the same demand; the concurrence in one of those opinions speaks eloquently and for the undersigned as well:

> It is difficult for me to imagine that I would make a similar choice were I in [petitioner's] position. What I might do, however, is not the test. [Petitioner] is an individual who, for reasons I can fathom only slightly, has chosen to forego his federal remedies. Assuming his competence, which on this record I must, he should be free to so choose. To deny him that would be to incarcerate his spirit the one thing that remains free and which the state need not and should not imprison.

*Lenhard v. Wolff*, 603 F.2d 91, 93 (9th Cir. 1979) (Sneed, J., concurring).

That said, based upon the sealed Forensic Report [Doc. 103], Hall's responses to the Court's questioning and his general demeanor during the Competency Inquiry, the absence of any objections to Dr. Baecht's report, and all the safeguards which have been effected to protect petitioner's rights, *see Michael v. Horn*, 459 F.3d 411, 420 (3d Cir. 2006) ("An appeal may not be withdrawn if the prisoner is incompetent."); *Carter v. Bradshaw*, 583 F.Supp.2d 872, 879 (N.D.Ohio 2008) (noting that this circuit "has found the right to be competent when a habeas petitioner chooses not to proceed"), the Court concludes that petitioner has the capacity to appreciate the nature and consequences of his decision to dismiss his habeas corpus proceedings and make a rational choice with respect to continuing or abandoning further litigation and is not suffering from a mental disease or defect, which would render him incompetent to make this decision.

11

## VII. Conclusion

Thus, the Court **FINDS** that Hall is competent to forgo his appeal and to dismiss his application for habeas corpus relief under 28 U.S.C. § 2254. Accordingly, a separate order will enter granting petitioner's motions which effectively seek those ends (i.e., Motions to Let Rule 42 Go into Effect and Motion to Not Appeal from a Judgment) and denying as moot the attorney-filed Motion to Alter or Amend the Judgment, [Docs. 87, 89, 91 and 93].

**ENTER**:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE